**[J-28A-C-2015]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF PUBLIC WELFARE, | : | No. 45 EAP 2014 |
| | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court entered on |
| | : | 2/19/14 at No. 1935 CD 2012 affirming |
| v. | : | in part and reversing in part the |
| | : | determination entered on 9/17/12 of the |
| JAMES EISEMAN, JR., AND THE PUBLIC | : | Office of Open Records at No. AP2011- |
| INTEREST LAW CENTER OF | : | 1098 |
| PHILADELPHIA, | : | |
| | : | |
| Appellants | : | ARGUED: May 5, 2015 |
| | | |
| AETNA BETTER HEALTH, INC., HEALTH | : | No. 46 EAP 2014 |
| PARTNERS OF PHILADELPHIA, INC., | : | |
| AND KEYSTONE MERCY HEALTH | : | Appeal from the Order of the |
| PLAN, | : | Commonwealth Court entered on |
| | : | 2/19/14 at No. 1949 CD 2012 affirming |
| | : | in part and reversing in part the |
| Appellees | : | determination entered on 9/17/12 of the |
| | : | Office of Open Records at No. AP2011- |
| v. | : | 1098 |
| | : | |
| JAMES EISEMAN, JR., AND THE PUBLIC | : | |
| INTEREST LAW CENTER OF | : | |
| PHILADELPHIA, | : | ARGUED: May 5, 2015 |
| | : | |
| Appellants | : | |
| | : | |
| UNITEDHEALTHCARE OF | : | No. 47 EAP 2014 |
| PENNSYLVANIA, INC. D/B/A | : | |
| UNITEDHEALTHCARE COMMUNITY | : | Appeal from the Order of the |
| PLAN AND HEALTHAMERICA | : | Commonwealth Court entered on |
| PENNSYLVANIA INC. D/B/A | : | 2/19/14 at No. 1950 CD 2012 affirming |
| COVENTRYCARES, | : | in part and reversing in part the |
| | : | determination entered on 9/17/12 of the |
| Appellees | : | Office of Open Records at No. AP2011- |
| | : | 1098 |
| v. | : | |
| | : | |
| JAMES EISEMAN, JR., AND THE PUBLIC | : | ARGUED: May 5, 2015 |

INTEREST LAW CENTER OF PHILADELPHIA,                    :
                                                        :
                                                        :
          Appellants                                    :

## *OPINION*

**MR. CHIEF JUSTICE SAYLOR**                    **DECIDED:  October 27, 2015**

These appeals, as well as a companion set, concern the extent of the public's statutory right of access to discrete information about the implementation of the Medical Assistance Program.

In Pennsylvania, the Medical Assistance or Medicaid Program is administered by the Commonwealth's Department of Human Services, which, in the time period relevant to the events underlying these appeals, was known as the Department of Public Welfare ("DPW" or the "Department").  Funded jointly by the federal and state governments, Medicaid directs public monies toward the provision of healthcare services to qualifying individuals with low incomes and limited resources.  *See generally* 42 U.S.C. §§1396 – 1396w-5; 62 P.S. §§441.1 – 449.  In implementing one pillar of the delivery system in the Commonwealth – via a program called HealthChoices -- DPW has negotiated and contracted with various managed care organizations ("MCOs") to render the essential services available to enrollees.  In the program's Southeast Zone,[1] five MCOs were selected.[2]

---

[1] This region is comprised of Berks, Chester, Delaware, Montgomery, and Philadelphia Counties.

[2] These are: Aetna Better Health, Inc., HealthAmerica Pennsylvania Inc. d/b/a CoventryCares, Health Partners of Philadelphia, Inc., Vista Health Plan, Inc. through Keystone Mercy Health Plan, and UnitedHealthcare of Pennsylvania, Inc. d/b/a United HealthCare Community Plan.

As is pertinent here, HealthChoices encompasses the provision of dental care to low-income children, certain adults, and some persons with disabilities in Pennsylvania. The five MCOs serving enrollees in the Southeast Zone engaged DPW-approved dental subcontractors ("Subcontractors") to fulfill the larger measure of the MCOs' contractual obligations. *See generally Dental Benefit Providers, Inc. v. Eiseman*, 86 A.3d 932, 937 (Pa. Cmwlth. 2014) (indicating that "[s]ubcontractors have built sophisticated networks of providers, enabling them to provide services to enrollees in a cost-effective manner."). Subcontractors then contracted with and paid providers of dental health care services to examine and treat Medicaid enrollees. In a few instances, however, MCOs arranged for services directly with providers.

In June 2011, James Eiseman, Jr. and the Public Interest Law Center of Philadelphia ("Requesters") tendered requests to DPW seeking records revealing, among other things, the rates that DPW paid to the MCOs for dental services in the Southeast Zone (the "Capitation Rates"), and the amounts paid by MCOs to provide dental services (the "MCO Rates"). These were submitted per the Right-to-Know Law.[3]

DPW denied the requests in relevant part. As is most germane to our present consideration, with regard to the MCO Rates, the Department indicated that it had been informed by each of the MCOs that the rates were "trade secrets and/or confidential proprietary information" protected against disclosure. *See* 65 P.S. §67.708(b)(11) (generally exempting from the requirement of public access a "record that constitutes or reveals a trade secret or confidential proprietary information"). Significantly, the Department did not deny that it possessed pertinent records; rather, it related that the

---

[3] Act of Feb. 14, 2008, P.L. 6, No. 3 (as amended 65 P.S. §§67.101 – 67.3104) (the "RTKL" or the "Law").

MCOs had instructed that "DPW is not to disclose" the rates. Letter of DPW Open Records Officer to James Eiseman, Jr., dated July 25, 2011, at 6.

Requesters lodged an appeal in the Office of Open Records (the "OOR"). *See* 65 P.S. §67.1101. *See generally Bowling v. OOR*, 621 Pa. 133, 141-42, 75 A.3d 453, 457-48 (2013) (describing the administrative tier of the appeals process under the RTKL). The five MCOs intervened as direct-interest participants, *see* 65 P.S. §67.1101(c), relying upon the trade-secrets/confidential-proprietary-information exemptions.[4]

At an evidentiary hearing, the MCOs offered expert and lay testimony to support the claimed exemptions. Additionally, the organizations adduced evidence that the disclosure of rate information would lessen the value of their investment in negotiating favorable rates.

The OOR, however, issued a final determination granting the relevant records requests. Initially, the appeals officer observed that records in the possession of a Commonwealth agency are presumed to be public, unless they qualify for an exemption under the RTKL or other law or are protected by a privilege, judicial order, or decree. *See id.* §67.305; *accord Bowling*, 621 Pa. at 140, 75 A.3d at 457. Furthermore, he explained, the Law places the burden of proof upon a public body to demonstrate exemptions. *See* 65 P.S. §67.708(a).

Of particular significance to his legal analysis, the appeals officer noted that the trade-secrets/confidential-proprietary-information exception does not extend to one statutorily-defined subset of public records, namely "financial records." *Id.* §67.708(c) (prescribing that "[t]he exceptions set forth in subsection (b) shall not apply to financial

---

[4] The Law employs the concepts of "exceptions" and "exemptions" interchangeably. *See* 65 P.S. §67.708.

records," subject to certain enumerated exceptions not applicable here). "Financial records," the appeals officer elaborated, include "[a]ny account, voucher, or contract dealing with . . . the receipt or disbursement of funds by an agency; or . . . an agency's acquisition, use or disposal of services[.]" *Id.* §67.102. Since the Department's agreements with the MCOs (containing the Capitation Rates) dealt with "the disbursement of billions of dollars in taxpayer funds for the acquisition of health insurance for Medicaid participants," the appeals officer concluded that they "cannot be considered anything but a 'financial record' under the RTKL." Final Determination in *Eiseman v. DPW*, No. AP 2011-1098, *slip op.* at 15 (OOR Sept. 17, 2012).

In the alternative, the appeals officer also considered whether the rates of payment to MCOs could be considered trade secrets or confidential proprietary information. He explained that a "trade secret" is defined by the RTKL, as well as in Pennsylvania's Uniform Trade Secrets Act,[5] as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that: . . . [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and . . . [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa.C.S. §5302; *see* 65 P.S. §67.102 (reflecting a materially identical formulation). *See generally* Final Determination in *Eiseman*, No. AP 2011-1098, *slip op.* at 13 ("[The Uniform Trade Secrets Act] provides injunctive relief and monetary damages to parties who have been harmed by the misappropriation of trade secrets, while the RTKL provides parties with protection from public disclosure by government agencies of

---

[5] Act of Feb. 19, 2004, P.L. 143, No. 14 (as amended, 12 Pa.C.S. §§5301-5308).

records which contain trade secrets." (citations omitted)). The appeals officer also related that the term "confidential proprietary information" is defined by the RTKL as "[c]ommercial or financial information received by an agency: . . . which is privileged or confidential; and . . . the disclosure of which would cause substantial harm to the competitive position of the person who submitted the information." 65 P.S. §67.102.

Although the appeals officer accepted that DPW and the MCOs treat the Capitation Rates as confidential information, he indicated that it was "not clear that [their] disclosure . . . would provide any economic value to the Department's counter-parties in future negotiations or would cause substantial competitive harm to the Department." Final Determination in *Eiseman*, No. AP 2011-1098, *slip op.* at 14. Accordingly, the appeals officer determined that DPW and the MCOs had failed to meet their burden of proof as to an exemption.

As to MCO Rates, the appeals officer relied substantially on *Lukes v. DPW*, 976 A.2d 609 (Pa. Cmwlth. 2009), to conclude that records containing such information also were not exempt. *See id.* at 627 ("[A] party that voluntarily participates in a public program and is receiving and disbursing public funds in furtherance of that program has no legitimate basis to assert that these activities are private and should be shielded from public scrutiny."). Although *Lukes* had been decided under the Law's predecessor, the appeals officer highlighted this Court's recent citation with approval to the decision. *See SWB Yankees LLC v. Wintermantel*, 615 Pa. 640, 665 n.19, 45 A.3d 1029, 1044 n.19 (2012). The appeals officer also found that the MCOs had failed to establish that they would suffer substantial harm if their rates were disclosed. *See* Final Determination in *Eiseman*, No. AP 2011-1098, *slip op.* at 18.

In a divided opinion, the Commonwealth Court sustained the portion of the OOR's determination concerning Capitation Rates, as the members of an *en banc* panel

unanimously agreed that contracts between DPW and the MCOs were financial records under the Law. *See DPW v. Eiseman (Eiseman I)*, 85 A.3d 1117, 1124 (Pa. Cmwlth. 2014) (*en banc*) (explaining that "[t]he Capitation Rates are records within DPW's possession that evidence its transaction of paying MCOs pursuant to the Medicaid HealthChoices Program" and otherwise are financial records pursuant to the statutory definition); *accord id.* at 1133 (McCullough, J., concurring and dissenting) ("I join the Majority in its conclusion that the Capitation Rates negotiated between DPW and the MCOs are subject to disclosure."). Although the majority agreed with the OOR's conclusion that the statutory trade-secrets/confidential-proprietary-information exception contained within the RTKL did not apply to financial records, it took the position that the Uniform Trade Secrets Act implicated a distinct analysis.

The majority explained that the RTKL prescribes that: "Nothing in this act shall supersede or modify the public or nonpublic nature of a record or document established in Federal or State law, regulation or judicial order or decree." 65 P.S. §67.306; *cf. id.* §67.3101.1 ("If the provisions of this act regarding access to records conflict with any other Federal or State law, the provisions of this act shall not apply."). In light of this provision, the majority opined that "Section 708(c) cannot dilute operation of another law that provides an independent statutory bar to disclosure." *Eiseman I*, 85 A.3d at 1124. Ultimately, however, the majority found that the Capitation Rates did not qualify as trade secrets, because DPW and the MCOs failed to explain how disclosure would impair their economic value. *See id.* at 1126-27.

While the members of the *en banc* panel all agreed that the Law required disclosure of the Capitation Rates, the viewpoints divided as concerns the MCO Rates. According to the majority, these were not aspects of financial records, since the rates are not contained in contracts "of a Commonwealth agency" and "do not involve

disbursement of funds by a Commonwealth agency." *Id.* at 1127 ("[T]he statute does not use the phrase 'disbursement of agency funds;' rather, the definition refers to disbursement of funds '*by* an agency.'" (emphasis in original)). In this regard, the majority viewed the MCO Rates as pertaining not to disbursements by a governmental entity, but disbursements by a contractor of the agency. *See id.* From the majority's perspective:

> That MCOs disbursed funds they received from DPW to their subcontractors does not render the MCOs mere conduits for public funds. Based on the language of the current RTKL, the funds lose their character as public funds once they leave an agency's hands and enter the private sector.

*Eiseman I*, 85 A.3d at 1127.

Having concluded that the MCO Rates were not contained within financial records, the majority turned to the broader set of exceptions to disclosure attaching to "public records," which include the express trade-secrets/confidential-proprietary-information exception. *See* 65 P.S. §67.708(b)(11). In this regard, the majority focused most closely on the confidential-proprietary-information aspect, first concluding that the MCO Rates were "confidential," on account of contractual and other measures taken to maintain secrecy. *See Eiseman I*, 85 A.3d at 1128. In terms of the "substantial harm to the competitive position" criterion, 65 P.S. §67.102, the majority found that this factor was established primarily based on expert testimony submitted by the MCOs regarding "industry practice, the highly sensitive nature of the information, and potential for substantial harm from its disclosure." *Eiseman I*, 85 A.3d at 1130. Accordingly, the majority concluded that the MCO Rates were protected from disclosure per the statutory exception. In a brief passage, the majority also opined that the information qualified for trade-secret status under the Uniform Trade Secrets Act. *See id.* at 1131.

Throughout its opinion, the majority expressly departed from the intermediate court's previous analysis in *Lukes*, taking the position that *Lukes* lacked relevance, given that the matter had been decided under the prior law. *See id.* at 1125, 1127.

Judge McCullough authored a concurring and dissenting opinion, in which she took the majority to task for what she characterized as a "cursory" and inapt treatment of *Lukes*. *Eiseman I*, 85 A.3d at 1136-37 (McCullough, J., concurring and dissenting) ("[T]he Majority's reliance upon its cited case law to abrogate *Lukes* on a completely unrelated and separate point of law is misplaced."). In her view, since the relevant substantive terms, as between the previous and new open-records laws, could not be distinguished by the majority (and, in fact, were materially identical), *Lukes* represented governing authority and commanded adherence. *See id.* at 1134-35. According to Judge McCullough, the majority also inappropriately glossed over material, functional terms within the statutory definition of "financial records." Along these lines, she explained:

> [T]he Majority's interpretation . . . effectively renders the words "any," "dealing," and "disbursement" superfluous and without meaning, and also ignores the fact that the funds originate with DPW . . .. [S]ection 102 of the RTKL is broad enough to include public funds that trickle down through contractor and subcontractor contracts ("any contract") because these contracts nevertheless "deal" with, or simply pass along down the line, the "disbursement of funds by an agency."

*Id.* at 1136-37 (citation omitted).

Consistent with the reasoning and holding of *Lukes*, Judge McCullough also stressed DPW's delegation of a governmental function and disbursement of public monies to the MCOs to fulfill that essential purpose. *See id.* at 1134-35. On this point, she reasoned:

> [T]he public funds originate with DPW, and no matter how many private entities the funds pass through, the funds end up in the hands of those performing the actual dental services and are the same funds that began with DPW. That is, public funds are used to pay for public dental insurance.

*Id.* at 1133. Since the MCO Rates qualified as financial records, Judge McCullough continued, the exemptions contained in Section 708(b) of the RTKL, including for trade secrets and confidential proprietary information, did not apply. *See* 65 P.S. §67.708(c).

Finally, she asserted that the Uniform Trade Secrets Act does not serve as an independent exemption to open-records disclosure, particularly given that the definitions of "trade secret" in the Uniform Trade Secrets Act and the RTKL are materially identical. *See Eiseman I*, 85 A.3d at 1138 (McCullough, J., concurring and dissenting). This similarly, Judge McCullough explained, evinced a legislative intent to transpose the effect of the Uniform Trade Secrets Act into Section 708(b)(11) of the RTKL. Thus, she concluded, the import of Section 708(c) – in terms of explicitly withholding the trade-secrets exception from any application to financial records -- trumped any independent application of the Uniform Trade Secrets Act. *Id.* at 1138-39 ("Indeed, it would be anomalous for our legislature to explicitly exclude trade secrets as an exception to disclosure of financial records in section 708(c) of the RTKL, while simultaneously implying that trade secrets are an exception requiring disclosure of the same financial records in section 3101.1 of the RTKL.").

Subsequent to the issuance of the Commonwealth Court's opinion, DPW disclosed the Capitation Rates to Requesters, and no party has further pursued a challenge to such tender. Therefore, only the MCO Rates remain in issue before us.

In the present briefing, consistent with Judge McCullough's concurring and dissenting opinion, Requesters maintain that records documenting the MCO Rates are financial records under the Law, including because they are contained within contracts

"dealing with" the "disbursement of funds" and "acquisition, use or disposal of services" by DPW. Brief for Appellants at 17, 28 (quoting 65 P.S. §67.102). Requesters highlight that the disclosure requirements pertaining to financial records are the most expansive, *accord Eiseman I*, 85 A.3d at 1133-34 (McCullough, J., concurring and dissenting) ("From a requester's standpoint, the most potent provisions of the RTKL are arguably sections 102 and 708(c) pertaining to financial records."), in light of the Legislature's aim of promoting confidence in government via transparency in fiscal matters.

Additionally, Requesters rely on the analysis contained in *Lukes*, which they contend is even more salient under the new Law, given that that the enactment was designed to provide greater, not lesser, openness. *Cf. Bowling v. OOR*, 621 Pa. 133, 140, 75 A.3d 453, 457 (2013) ("In 2008, the General Assembly enacted the RTKL, which replaced the [Right to Know Act] and provided for significantly broadened access to public records."); *Levy v. Senate of Pa.*, 619 Pa. 586, 618, 65 A.3d 361, 381 (2013) ("[T]he enactment of the RTKL in 2008 was a dramatic expansion of the public's access to government documents."). According to Requesters, "[i]t is impossible to square the Commonwealth Court's discarding of *Lukes* with the conclusion of *SWB Yankees* that the RTKL expands access to public records and with [*SWB Yankees'*] favorable treatment of *Lukes*." Brief for Appellants at 20. Requesters also depict the majority decision of the Commonwealth Court as a departure from a long line of decisions of this Court, such as *Sapp Roofing Co. v. Sheet Metal Workers' International Association, Local Union No. 12*, 552 Pa. 105, 109, 713 A.2d 627, 629 (1998) (plurality) (holding that payroll records of a private roofing contractor in the custody of a local agency were public records, because they evidenced a disbursement by a governmental unit).[6]

---

[6] Although *Sapp Roofing* was a plurality decision, three of the five Justices participating in the decision agreed that the payroll records were public records for purposes of the
(continued…)

Requesters note that, in other geographic areas of the Commonwealth, DPW has administered Medicaid as a fee-for-services program, rather than through managed care organizations. They urge that "[t]he insertion of middlemen – MCOs and subcontractors – between DPW and providers does not change the fact that DPW receives and expends federal and state Medicaid moneys so that, ultimately, the child can get his cavity treated." Brief for Appellants at 26 ("The Commonwealth's purpose is not to issue payments to private insurance companies or to enrich providers, but to ensure that specified members of society have access to healthcare."); *accord Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 538 (3d Cir. 2002) (*en banc*) ("It is . . . apparent from the statutory language [in the Medicaid Act] that the intended beneficiaries of [42 U.S.C. §1396a(a)(30)(A)] are recipients, not providers.").

In terms of the trade-secrets issue, Requesters maintain that Section 708(c) of the RTKL reflects a policy judgment, on the part of the General Assembly, that openness of records related to public-funds expenditures is so important to the promotion of confidence in government that the trade-secrets and confidential-proprietary-information exceptions must yield to disclosure. The Commonwealth Court's decision, they assert, nullifies this salutary aim. Requesters reject as perverse the notion that the Uniform Trade Secrets Act may be interposed independently of Section 708(c), particularly given the express displacement of the self-contained trade-secrets protection within the four corners of the Law itself.

As a policy matter, Requesters urge that the Commonwealth Court's decision thwarts essential public access to a wide range of records documenting the administration of vital and costly public programs through private contractors. In an

---

(…continued)
former open-records law. *See Sapp Roofing*, 552 Pa. at 109, 713 A.2d at 629; *id.* at 112, 713 A.2d at 630 (Zappala, J., concurring).

*amicus* submission, Daniel Polsky, PhD, of the University of Pennsylvania elaborates extensively on the salient policy considerations. *See, e.g.*, Brief for *Amicus* Daniel Polsky, PhD, at 9-10 (positing that restrictions on access to negotiated rate information pertaining to the administration of the Medicaid program diminishes government accountability by impeding an essential exploration of whether access to and quality of care is being compromised by the payment regime); *accord* Brief for Appellants at 14 ("Shielding from public view how nearly one third of the General Fund budget flows from DPW to providers substantially undermines [the Law's] goal.").

The MCOs, on the other hand, take a different position concerning the relevant policies. From their point of view,

> [f]ar from being mere conduits of public funds, the MCOs act as risk-bearing entities, responsible for providing all covered medical services, including dental services, to their members. Whether those services can be delivered at more or less cost to the MCO directly impacts the bottom-line of the MCO, not the finances of the Commonwealth.

Brief for Appellees Health Partners of Philadelphia, Inc., *et al.*, at 15. According to the MCOs, public dissemination of otherwise confidential contractual payment rates would discourage private entities from doing business with the Commonwealth, thus limiting that option for securing goods and services necessary to public service. Such access would not serve the purpose of governmental transparency laws, they argue, since the contracts involved concern negotiations and relationships among private, rather than governmental, entities. According to the MCOs and their *amici*, preserving secrecy for the MCO Rates promotes investment, innovation and competition; maintains lower Medicaid costs; and affords Medicaid enrollees broader provider choices. *See, e.g.*, Brief for *Amicus* America's Health Ins. Plans at 14-23; Brief for *Amicus* the Pa. Coalition

of Med. Assistance Managed Care Orgs. at 6-16 (elaborating extensively on policy considerations attending disclosure or non-disclosure of the MCO Rates).

One faction of the MCOs -- UnitedHealthcare of Pennsylvania, HealthAmerica Pennsylvania Inc., and Aetna Better Health, Inc. -- urge that this Court's review should be closely confined to the question of whether the MCO Rates constitute confidential proprietary information. *See, e.g.*, Brief for Appellees UnitedHealthcare, *et al.*, at 15 ("This Court should affirm because the record supports the Commonwealth Court's finding below: that the rates paid by the private contractor health plans to the dental sub-contractors constitute 'confidential proprietary information' under the Right-to-Know Law."). They assert that the record amply supports the Commonwealth Court's determination on this score and characterize Requesters' arguments concerning the financial-records aspect as collateral and technical in nature. *See id.* at 23-24. These MCOs also posit that the Commonwealth Court "struck a fair balance" by requiring that government-paid rates must be disclosed under the RTKL, but that the rates which private health plans pay to Subcontractors need not be disclosed. *Id.* at 11-12 ("The court below enforced the public's right to know what the government has paid for a program, while simultaneously preserving the health plans' abilities to compete in the marketplace by shielding their confidential competitive information from harmful disclosure."). According to this group, there simply is no nexus between public access to the MCO Rates and government transparency, and Requesters' efforts to obtain additional information represent "meddling" and "pry[ing] into the protected files of the health plans." *Id.* at 12-13.

All of the MCOs, as well as dental-services subcontractor Dentaquest LLC, suggest that "financial records," under the Law, subsume "only those showing the agency's *own* disbursements." *See id.* at 25 (emphasis in original). Furthermore, they

contend, in effect, that the MCO Rates are simply too remote from Department contracts and disbursements to qualify as records "dealing with" such contracts and disbursements. *See* 65 P.S. §67.102.[7]

In terms of the confidential-proprietary-information exception, the MCOs stress the protection of confidentiality expressed in their subcontracts. Furthermore, they elaborate upon the ample lay and expert witness testimony evidencing that the MCO Rates have been kept secret and that the plans would be harmed by public disclosure. *See, e.g.*, Brief for Appellees UnitedHealthcare, *et al.*, at 19 ("[T]he health plan executives provided extensive testimony respecting the confidential nature and treatment of the rates they pay the sub-contractors, including testimony that: the information is accorded such treatment in the contracts with the plans' sub-contractors; access to the rates is limited to a 'need to know' basis; security measures are in place to protect the rates; and internal and external disclosure is prevented.").

Two of the MCOs, joined by subcontractor Dentaquest LLC, lead with the proposition that records reflecting the MCO Rates -- including agreements between MCOs and Subcontractors -- are not "public records" at all, because they are not in the Department's possession. *See* 65 P.S. §67.102 (defining a "public record" as one "of a Commonwealth or local agency"). These appellees also take the position that, even if records revealing the MCO Rates are deemed to be public, they are not "financial records," and, to the degree which they may be deemed to be financial records, the Uniform Trade Secrets Act applies in any event to protect them from public disclosure.

---

[7] In point of fact, the briefs submitted by the MCOs avoid developed treatment of the statute's broad "dealing with" nexus defining financial records. *See, e.g.*, Brief for Appellees UnitedHealthcare of Pa., *et al.* at 25 (asserting that the Legislature defined financial records as those "*showing* the agency's own disbursements" (emphasis adjusted)).

DPW also now asserts that it simply does not possess records reflecting the MCO Rates. Therefore, the Department requests that, if this Court concludes that the Law requires disclosure, we should direct the MCOs to supply the records to Requesters. Otherwise, DPW relies upon the content of the MCOs' briefs in support of its own position favoring affirmance.

Our present review turns on matters of statutory construction, over which our review is plenary. Additionally, we are obliged to liberally construe the Law to effectuate its salutary purpose of promoting "access to official government information in order to prohibit secrets, scrutinize actions of public officials, and make public officials accountable for their actions." *Levy*, 619 Pa. at 619, 65 A.3d at 381 (quoting *Allegheny Cnty. Dep't of Admin. Servs. v. A Second Chance, Inc.*, 13 A.3d 1025, 1034 (Pa. Cmwlth. 2011)).

At the outset of our review, we find that the assertion that DPW neither possesses nor controls records reflecting the MCO Rates (and, thus, they are not "records of an agency") is not well taken. The Department did not claim non-possession in its response to the initial open-records requests, and it was agreed by all at the hearing stage that the only issue was whether disclosure *exceptions* applied. *See, e.g.*, N.T., May 21, 2012, at 16-17 (reflecting DPW's advancement of the trade-secrets exception as the basis for denial of the request for records subsuming the MCO Rates); *id.* at 18, 21 (memorializing the remarks of counsel for the MCOs that the hearing involved "a very narrow issue" and "narrow questions" concerning the applicability of the trade-secrets/confidential-proprietary-information exception). Furthermore, it is undisputed that managed care organizations are required to submit subcontracts delegating their healthcare-related responsibilities to DPW for the agency's advance written approval, per the Department's standard written contract. *See, e.g.*,

HealthChoices Physical Health Agreement at 87 (version effective July 1, 2010). This is unsurprising, of course, since the undertaking entails the allocation of a vital governmental function.

In light of this course of development, we granted discretionary review to consider the Commonwealth Court's conclusions relative to the financial-records issue and trade-secrets/confidential-proprietary-information exceptions. *See DPW v. Eiseman*, ___ Pa. ___, 106 A.3d 610 (2014) (*per curiam*). To the extent that the Department may encounter difficulties flowing from our present focus on those questions, these would appear to be substantially of its own making. The Legislature designed the RTKL to afford reasonable and efficient access to public information; it contravenes this salutary purpose for the Department to advance shifting positions in opposing disclosure; and, accordingly, we will confine our review and mandate to the matters upon which appeal was allowed.

As to those issues, first, we agree with Requesters, the OOR appeals officer, and Judge McCullough that documents required to be submitted to DPW reflecting the MCO Rates are "financial records" under the Law. *See* 65 P.S. §67.102. In this regard, while DPW and the MCOs would prefer to emphasize the definitional language associating contracts and disbursements with a government agency, *accord supra* note 7, the statute plainly reaches more broadly via its prescription that "financial records" encompass records "dealing with" disbursements of public money and services acquisitions by agencies. *See* 65 P.S. §67.102; *cf. N. Hills News Record v. Town of McCandless*, 555 Pa. 51, 55, 722 A.2d 1037, 1039 (1999) (explaining that language within the former open-record's law's definition of "public record" – which the Legislature reposited in the definition of "financial record" under the new Law – reaches some range

of records beyond accounts, vouchers, or contracts, subsuming records which "bear a sufficient connection" to such fiscally-related categories).[8]

The MCOs' position that "[t]his dispute does not relate to [*i.e.*, "deal with"] any payments actually made by the Pennsylvania government," Brief for Appellees UnitedHealthCare, *et al.*, at 4, greatly understates the relationship between government contracts with managed care organizations and the subcontracts by which such entities chose to fulfill their contractual undertakings with the Commonwealth. In other words, subcontracts containing MCO Rates plainly "deal with" DPW's disbursement of billions of dollars of public monies to provide access to essential healthcare to vulnerable populations, as well as the Department's acquisition of services to meet its own obligations under federal and state law (albeit through middlemen). *See* 65 P.S. §67.102.

According to the MCOs, reliance on the above rationale to conclude that MCO Rates are contained within "financial records" yields disclosure of private-contractor records without rational limitation. *See, e.g.*, Brief for Appellees UnitedHealthcare, *et*

---

[8] In opining that the MCO Rates are not contained within "financial records" for purposes of the Law, the dissent focuses exclusively on the fragment of the statutory definition denoting "disbursement of funds by an agency." Dissenting Opinion, *slip op.* at 1 (quoting, indirectly, 65 P.S. §67.102). As explained above, however, the definition of "financial records" does not pertain solely to agency disbursements *per se*, but rather, it extends by its terms to accounts, vouchers and contracts "*dealing with* . . . disbursement of funds by an agency." 65 P.S. §67.102 (emphasis added). In statutory interpretation, courts are obliged to give effect to all of the provisions of a statute. *See* 1 Pa.C.S. §1921(a) (emphasis added).

Notably, along these lines, the dissenting opinion does not suggest that key documents such as dental-services subcontracts which must be submitted to and approved by DPW do not "*deal[] with*" the large-scale disbursements of public monies being channeled through the MCOs and Subcontractors attendant to the performance of delegated healthcare responsibilities. 65 P.S. §67.102 (emphasis added).

*al.*, at 27 ("[U]nder [Requesters'] reading of the statute, all a requestor [sic] would need to do to defeat any of [the] exemptions would be to establish some connection, *however remote*, to 'public funds.'" (emphasis added)); Brief for Appellees Health Partners of Philadelphia, Inc., *et al.*, at 16-17 ("The fundamental flaw in [Requesters'] arguments is their reliance on the purported existence of a broad right of public access . . . to all documents having *any connection whatsoever* with the carrying out of any governmental function, regardless of their remoteness from a government agency[.]" (emphasis added)). We differ with this criticism for several reasons.

First, not all private-contractor documents must be submitted to a government agency for approval. It is this initial requirement which separates subcontracts containing the MCO Rates from third-party records (to which a distinct legal analysis applies, *see* 65 P.S. §67.506(d)).[9] *Cf. Sapp Roofing*, 552 Pa. at 109, 713 A.2d at 629 (discussing the open-records treatment of payroll records of a private contractor which were required to be submitted to the government).[10] Along these lines, the MCOs'

___

[9] This is not to say that the MCO subcontracts would not qualify for public disclosure as third-party records under Section 506(d) of the Law. *See generally* Reply Brief for Appellants at 25 (taking the position that, [e]ven if DPW lacked actual possession, the records would be public records of DPW under Section 506(d)(1) of the RTKL, 65 P.S. §67.506(d)(1)"). Our point here is only that the submission-and-approval requirement for subcontracts renders the documents agency financial records, even exclusive of Section 506(d)(1), which, in any event, is outside the scope of the questions upon which appeal was allowed. *See Eiseman*, ___ Pa. ___, 106 A.3d 610.

[10] It can hardly be disputed that the subcontracts would qualify as "records of an agency" under *Sapp Roofing*, because they are plainly an essential component of an agency decision, *i.e.*, approval of the subcontract. *See Sapp Roofing*, 552 Pa. at 109, 713 A.2d at 629 ("Pursuant to the Right to Know Act, to be available for inspection, the records must be both public records and records *of a state agency*." (emphasis added)).

Parenthetically, contrasting with the approach under the Right to Know Act, the RTKL decouples the "of an agency" criterion from the statute's main operative provision for access. *Compare* 65 P.S. §66.2 ("Every public record *of an agency* shall, at reasonable (continued…)

argumentation is laden with the implication that DPW does not possess the subcontracts in issue, whereas our analysis presumes that the Department does have possession (since the standard contract requires submission of those contracts, and neither DPW nor the MCOs asserted non-possession as this litigation evolved as a basis for denying the relevant open-records requests).

Second, since the Legislature did not choose to address disclosure of records pertaining to Medicaid disbursements on specific terms, it has fallen to the courts to provide necessary clarification incrementally through the decisional law process. *Cf. SWB Yankees*, 615 Pa. at 662-64, 45 A.3d at 1042-43 (elaborating upon the task of construing a new statutory regime and making an inroad into development in a discrete setting). It is not a satisfactory solution, in our view, to disregard the policy of liberal interpretation of a remedial statute in favor of a bright-line rule which, while facilitating ease of application, is plainly under-inclusive given the governing statute's utilization of language establishing a broader nexus.

---

(…continued)
times, be open for examination and inspection by any citizen of the Commonwealth of Pennsylvania.") (repealed), *with id.* §67.701(a) (prescribing that "[u]nless otherwise provided by law, a public record, legislative record or financial record shall be accessible for inspection and duplication in accordance with this act," without reference to whether the record is "of an agency"). Notably, the Law's definition of "public record" contains an of-an-agency delimiter, *see id.* §67.102, but the definition of "financial record" – which is specifically and independently referenced in the Law's core access provision (*i.e.* Section 701) – does not include such element, *see id.*

It is not necessary to the resolution of these appeals to consider whether this omission from the definition of "financial record" may have been by intention or oversight. In any event, it is worth noting that Section 506(d)(2) of the RTKL places a limitation on mandatory disclosure of third-party records, or at least those in possession of a third party which has contracted with an agency. *See id.* §67.506(d)(2).

We recognize that the policy considerations involved here are deeply mixed, given the potential cost efficiencies which may be available to the government through access to the managed care industry, as well as the substantial proof of impact of MCO-Rate disclosure upon that industry's business practices. Indeed, given the significance of the Medicaid program including its vast budgetary impact, the law would certainly benefit from a directed assessment by the General Assembly, bringing to bear its superior policymaking resources to determine the appropriate parameters of open-records disclosure in the Medicaid arena,[11] rather than continuing to channel the inquiry through highly-generalized open-records provisions. Nevertheless, in the absence of such a legislative evaluation, we are simply unable to conclude that records which must be submitted to a government agency for approval, and which embody a delegation (albeit a downstream delegation) of a governmental function of the agency, are not records "dealing with" the agency's monetary disbursements and services acquisitions. *See* 65 P.S. §67.102.

With regard to such financial records, it is essentially undisputed that Section 708(c) renders the Law's own internal trade-secrets/confidential-proprietary-information exception inapplicable. *See* 65 P.S. §67.708(c) (establishing, as a general rule, that "[t]he exceptions set forth in subsection (b)," including the trade-secrets/confidential-proprietary-information exception, "shall not apply to financial records"). Accordingly, the sole remaining issue is whether the Uniform Trade Secrets Act protects the financial records containing the MCO Rates from disclosure.

---

[11] *See generally Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP,* 605 Pa. 269, 301–02 & n.27, 989 A.2d 313, 332–33 & n.27 (2010) (referencing the General Assembly's capabilities for information-gathering, debate, and deliberation and explaining that, "[u]nlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion").

Initially, we observe that contractual payment rates are not a close fit with the concept of a "trade secret," as it is substantially debatable whether such rates are in the nature of a "formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process." *See* 12 P.S. §5302. Perhaps for this reason, the majority of the MCOs do not advance the trade-secrets theory, but rather, confine their position to the more comfortable proposition that the rates are confidential proprietary information.[12]

In any event, we agree with Judge McCullough that the Law's self-contained trade-secrets exception supplants the more general application of the Uniform Trade Secrets Act based, *inter alia*, on the principle of statutory construction that more specific provisions control over general ones. *See* 1 Pa.C.S. §1933 (prescribing that a special provision in a statute "shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail."). In this regard, it seems unlikely that the Legislature would have specifically withheld trade-secrets protection relative to financial records within the four corners of the Law on the theory that such protection persists under another statutory regime. Rather, if the General Assembly wished for dissemination to be withheld, it would have been a straightforward matter to provide for redaction of trade-secrets information in Section 708(c) of the Law, as was done in relation to eight of the other openness exceptions which are otherwise withheld from financial records. *See* 65 P.S. §67.708(c). Although

---

[12] As noted, however, confidential proprietary information within financial records is subject to public disclosure under the Law. *See* 65 P.S. §67.708(c). Further, the MCOs have not identified any independent statutory scheme which might otherwise protect "confidential proprietary information" as such.

the RTKL does generally recognize the primacy of other laws, *see* 65 P.S. §§67.306, 67.3101.1, it is our considered judgment that the Law's own express and specific treatment of trade secrets should control in this instance. *Accord* 1 Pa.C.S. §1933.[13]

In terms of the discussion of the *Lukes* decision, we do not find it useful to consider the downstream point at which public funding transforms into private monies. Rather, our focus remains upon our conclusion that records which were required to be submitted to and approved by DPW, and which reflect the central means of implementing a core departmental function, are records "dealing with" DPW's disbursement of public monies and its responsibility to afford access to healthcare services in furtherance of the public interest. *Cf. SWB Yankees*, 615 Pa. at 665 n.19, 45 A.3d at 1044 n.19 ("Particularly in the context of a government agency's wholesale delegation of its own core governmental function to another entity, we find that a reasonably broad perspective concerning what comprises transactions and activities of the agency should be applied.").

The order of the Commonwealth Court is reversed relative to the MCO Rates, and the matter is remanded for further proceedings consistent with this opinion.

Mr. Justice Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Justice Eakin files a dissenting opinion.

---

[13] Moreover, if we were to hold that Sections 306 and 3101.1 of the Law prevented dissemination of public records containing trade secrets, via application of the Uniform Trade Secrets Act, the trade-secrets aspect of the exception in Section 67.708(b)(11) would be rendered into a mere redundancy. Such a holding, however, would contravene the presumption that the Legislature does not fashion statutory prescriptions as surplusage. *See* 1 Pa.C.S. §1921(a); *Commonwealth v. Ostrosky,* 589 Pa. 437, 450, 909 A.2d 1224, 1232 (2006).