CONCURRING/DISSENTING OPINION BY JUDGE McCULLOUGH I concur with the Majority insofar as it: grants the application of Bruce Baron (Re-questor) to quash the notice of intervention filed on behalf of Health Partners Plans, Inc.; rejects Requestor’s due process challenges; concludes that the automatic stay of disclosure set forth in section 1301(b) of the Right-To-Know Law (RTKL)[1] applies here; and concludes that estoppel, premised upon the Supreme Court’s decision in Department of Public Welfare v. Eiseman, 633 Pa. 366, 125 A.3d 19 (2015), is inapplicable here. However, I respectfully dissent from the Majority insofar as it: concludes that Eiseman is distinguishable and inapplicable here; concludes that the requested records are not within the control of the Department of Human Services (DHS) and are not financial records under section 901 of the RTKL, 65 P.S. § 67.901; and remands to the Office of Open Records (OOR) to analyze the direct relationship prong under section 506(d)(1) of the RTKL, 65 P.S. § 67.506(d)(1). Contrary to the Majority, I believe that OOR properly applied Eiseman herein to conclude that the requested records are financial records and not subject to exception as a trade secret or confidential proprietary information. Additionally, I would affirm the Final Determination of OOR that the requested records are within DHS’ possession under section 506(d)(1) of the RTKL. In Eiseman, our Supreme Court reversed this Court’s holding that managed care organization (MCO) rates were protected from disclosure under the trade secrets/confidential proprietary information exception found in section 708(b)(11) of the RTKL, 65 P.S. § 67.708(b)(11). The Court in Eiseman concluded that the requested documents therein, namely, the rates paid by certain MCOs to providers of dental services in the southeast zone of Pennsylvania, constituted “financial records” under section 102 of the RTKL, 65 P.S. § 67.102, to which the trade secrets/confidential proprietary information exception did not apply. Although these MCO rates were negotiated directly between MCOs and the providers, the Court stressed that MCOs were required to submit subcontracts delegating their healthcare-related responsibilities to DPW for that agency’s approval and that, ultimately, these subcontracts “plainly ‘deal with’ DPW’s disbursement of billions of dollars of public monies to provide access to essential healthcare to vulnerable populations, as well as [DPW’s] acquisition of services to meet its own obligations under federal and state law (albeit through middlemen).” Eiseman, 125 A.3d at 30. I believe this same rationale applies equally here. While the public monies are disbursed to the MCOs and the MCOs then pay these monies to providers based upon privately negotiated rates, the character of the same as public monies does not change. Similar to the MCOs in Eise-man, the MCOs in this case have contracted with DHS to perform the governmental function of rendering the services that are part of the MA program and the MCOs simply act as the middlemen in the disbursement of public monies for the provision of these services. Our Supreme Court in Eiseman concluded that the term “financial records” should be broadly construed to “encompass records ‘dealing with’ disbursements of public money and services acquisitions by agencies.” Eise-man, 125 A.3d at 29 (citations omitted). Consistent with Eiseman, I believe the records requested in this case likewise constitute “financial records” under the RTKL. As such, section 708(c) of the RTKL, 65 P.S. § 67.708(c), renders the trade secrets/confidential proprietary information exception inapplicable to these records. Nevertheless, the Majority agrees with designated Petitioners herein that Eise-man is distinguishable from the present case because the former was premised on the review and approval of MCO rate contracts by DHS (then referred to as DPW), whereas DHS in this case does not provide such direct review and approval of the MCO rates paid to nursing home service providers that participate in the Medical Assistance (MA) program, HealthChoices. While I agree that DHS’ possession, as ■well as its review and ápproval of, the MCO rate contracts was a significant consideration for the Court in Eiseman, I disagree with the Majority that the requested records in this case were not subject to DHS’ review. Although the Majority correctly states that OOR credited the affidavits submitted by DHS which established that participating nursing home service providers were not required to report the rates paid by the MCOs, OOR found that said providers were required to report their MA MCO days on their MA-11 cost report. Indeed, DHS’ regulations expressly incorporate MCO rates paid to nursing home service providers into the definition of a “MA day of care,” see 55 Pa. Code § 1187.2,[2] and these providers are required to submit MA-11 cost reports to DHS within 120 days following close of the fiscal year, see 55 Pa. Code § 1187.73(b).[3] Additionally, DHS is required to audit and verify the records of nursing home service providers with respect to MCO days and rate payments, and these providers are required to retain fiscal records to support their cost reports. See 55 Pa. Code § 1187.77.[4] Further, DHS is required by both federal and state law to oversee the MA program. More specifically, federal law requires DHS to enlist providers so that MA care and services are available, see 42 U.S.C. § 1396a(a)(30),[5] and state law requires DHS to promulgate payment regulations for nursing home providers, to pay the providers for services rendered to eligible recipients, see section 443.1(7) of the Human Services Code (Code),[6] and to ensure , providers’ compliance with the Code and DHS regulations, see section 1402(e) of the Code, 62 P.S. § 1402(e).[7] In. light of the federal and state law requirements and DHS’ - regulations, it would appear that DHS has the necessary “possession, custody or control” of the requested records as required by section 901. However, I would note that OOR never made a determination as to section 901, and a remand would be warranted in that regard. Instead, OOR found that DHS' maintained possession under section 606(d)(1) of the RTKL, which provides that: A public record that is not in the possession of an agency but is in the possession of a -party -with whom the agency has contracted to perform a governmental function on behalf of the agency, and which directly relates to the governmental function and is not exempt under this act, shall be considered a public record of the agency for purposes of this act. 65 P.S. § 67.606(d)(1). In Dental Benefit Providers, Inc. v. Eiseman, 633 Pa. 205, 124 A.3d 1214 (2015), our Supreme Court held that rates paid by subcontractors to providers were not subject to disclosure under section 506(d)(1) because there was no actual contract between DHS and the providers. In other words, the payments in such a case were twice removed from DHS, i.e., DHS paid an MCO, the MCO paid a subcontractor, and the subcontractor then paid the provider.' However, in this casé, DHS had contracted with the MCOs to administer services under the MA HealthChoices program; thus, the MCOs stand in the shoes of DHS when contracting with', and making payment to, the nursing home service providers. Hence, I would affirm the Final Determination of OOR concluding that the rates paid by the MCOs to the nursing home service providers constitute a public record of DHS under section 506(d)(1). . Act of February 14, 2008, P.L. 6, 65 P.S. § 67.1301(b). . This regulation defines "MA day of care” as follows: A day of care for which one of the following applies: (i) The Department pays 100% of the MA rate for an MA resident. (ii) The Department and the resident pay 100% of the MA rate for an MA resident. (iii) An MA MCO or an [Long-Term Care Capitated Assistance Program] provider that provides managed care to MA residents, pays 100% of the negotiated rate or fee for an MA resident’s care. (iv) The resident and either an MA MCO or LTCCAP provider that provides managed care to an MA resident, pays 100% of the negotiated rate or fee for an MA resident's care. (v) The Department pays for care provided to an MA resident receiving hospice services in a nursing facility. 55 Pa. Code § 1187.2. . This regulation provides, in pertinent part, that "[a] nursing facility shall submit an acceptable MA-11 to the Department within 120 days following the June 30 or December 31 close of each fiscal year as designated by the nursing facility. An acceptable MA-11 is one that meets the requirements in § 1187.71(e) (relating to cost reporting).” 55 Pa. Code § 1187.73(b). Section 1187.71(a) of the regulations sets forth an exhaustive list of 49 different costs, including resident care costs, other resident related costs, administrative costs, and capital costs, that are part of the MA-11 cost report. 55 Pa. Code § 1187.71(a). Sections 1187.71(d) and (e)(4) require a nursing facility to maintain and submit financial and statistical records, and any other documentation, verifying these costs. 55 Pa. Code 1187.71(d), (e)(4). .This regulation provides that: (a) The Department will audit acceptable cost reports filed to verify nursing facility compliance with: (1) This chapter. (2) Chapter 1101 (relating to general provisions). (3) The schedules and instructions attached to the MA-11. (b) A nursing facility shall make financial and statistical records to support the nursing facility’s cost reports available to State and Federal representatives upon request. (c) The Department will conduct audits in accordance with auditing requirements set forth in Federal regulations and generally accepted government auditing standards. (d) The Department will conduct an audit of each acceptable cost report with an end date of June 30, 1996, or December 31, 1996, and thereafter within 1 year of the Department’s acceptance of the cost report. This subsection will not apply if the nursing facility is under investigation by the Attorney General. (e) The auditor will certify to the Department the allowable cost for the nursing facility to be input into the [Nursing Information System] database for use in determining the median costs. (f) A nursing facility that has certified financial statements, Medicare intermediary audit reports with adjustments and Medicare reports, for the reporting period .shall submit these reports with its cost report, at audit or when available, 55 Pa. Code § 1187,77(a)-(f). .Section 1396a(a)(30) of the Federal Social Security Act addresses state plans for medical assistance and requires a state plan to: provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are .consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area ..... 42 U.S.C. § 1396a(a)(30), , Act of June 13, 1967, P.L. 31, added by the Act of July 31, 1968, P.L. 904, as amended, 62 P.S. § 443.1(7). This section states, in pertinent part, that: payments to county and nonpublic nursing facilities enrolled in the medical assistance program as providers of nursing facility services shall be determined in accordance with the methodologies for establishing payment rates for' county and nonpublic nursing facilities specified in the department’s regulations and the Commonwealth's approved Title XDC State Plan for nursing facility services .... . Section 1402(e) .of the Code provides that "[e]ach nursing facility shall be inspected at least twice annually for compliance with this act and regulations of the department.” 62 P.S. § 1402(e).