# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Garrett Hancock : 
Optum Inc. : 
 : 
        v. : No. 846 C.D. 2022
 : Argued: June 5, 2023
Magellan Behavioral Health : 
of Pennsylvania Inc., : 
        Appellant : 

BEFORE:    **HONORABLE RENÉE COHN JUBELIRER,** President Judge
                **HONORABLE ELLEN CEISLER,** Judge
                **HONORABLE BONNIE BRIGANCE LEADBETTER,** Senior Judge


<u>**OPINION NOT REPORTED**</u>


**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**      **FILED: August 15, 2023**


Magellan Behavioral Health of Pennsylvania Inc. (Magellan) appeals from the Order entered in the Court of Common Pleas of Montgomery County (common pleas) on July 6, 2022, granting Optum Inc.'s (Optum) and Garrett Hancock's (Hancock) (collectively, Requesters) Petition for Review of the Office of Open Records (OOR) Final Determination issued on July 16, 2021. After a competitive bidding process, Montgomery County (County) and Magellan, a Pennsylvania Managed Care Organization (MCO), entered in March 2021, into what was ultimately titled an Amended and Restated Agreement (the Agreement) and which had been dated January 1, 2021. The Agreement sets forth the terms under which Magellan will provide and deliver services to County under the HealthChoices Behavioral Health Program (HealthChoices Program) implemented by the Pennsylvania Department of Human Services (DHS) for Medical Assistance

(Medicaid) recipients. Requesters tendered a Right-to-Know Law (RTKL)[1] request seeking copies of the current and original contract along with all amendments and/or revisions. County and Magellan argued that the Agreement contained confidential proprietary and/or trade secret information which is protected from disclosure under Section 708(b)(11) of the RTKL and/or under the Uniform Trade Secrets Act (UTSA), 12 Pa.C.S. §§ 5301-5308. The OOR agreed and ordered County to provide Requesters a redacted version of the Agreement. Requesters filed an appeal with common pleas arguing that the provisions of the Agreement, and the Agreement itself, constitute financial records as defined by Section 102 of the RTKL, 65 P.S. § 67.102, which must be disclosed to Requesters without redaction pursuant to Section 708(c) of the RTKL, 65 P.S. § 67.708(c). Following its review of the unredacted Agreement *in camera*, common pleas determined that Requesters were entitled to disclosure of the entire Agreement, as none of the redactions permitted by the OOR qualified for exemption. Following a careful review of the entire record, including the unredacted Agreement, we affirm.

## I.    BACKGROUND

Under the terms and conditions of the Agreement, Magellan serves as County's Behavioral Health MCO responsible for providing and delivering services to County under the HealthChoices Program implemented by DHS for Medicaid recipients. (Common pleas' July 6, 2022, Memorandum and Order (July Opinion), Finding of Fact (FOF) ¶ 1.) Optum provides managed care services, which makes it a competitor, or a potential competitor, of Magellan. (*Id.* ¶ 2.) Hancock is one of Optum's employees. (*Id.* ¶ 3.)

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

2

On March 16, 2021, Hancock submitted a written request to County for a copy of the Agreement. (*Id.* ¶ 4.) After invoking the 30-day extension period set forth in Section 902 of the RTKL, 65 P.S. § 67.902,[2] County partially denied the request on April 16, 2021, to the extent it believed that the requested information would require disclosure of Magellan's trade secrets and/or confidential proprietary information protected under Section 708(b)(11) of the RTKL.[3] (FOF ¶ 5.) As a result of its determination, County provided Hancock with a redacted copy of the Agreement. (*Id.*)

### A. *Proceedings before the OOR*

On April 30, 2021, Hancock filed an appeal with the OOR, and the OOR permitted Magellan to participate therein as a direct interest participant.[4] (*Id.* ¶¶ 6-7.) The parties submitted documents and presented legal briefs to the OOR in support of their respective positions. (*Id.* ¶ 8.) Among Magellan's submissions was a nine-page affidavit of James P. Leonard, Magellan's Chief Executive Officer (Leonard Affidavit). (*Id.*) As part of his responsibility for managing Magellan's

---

[2] Section 902 allows a governmental agency, upon notice to the requester, to extend the amount of time to respond to a request under certain circumstances, including when the request requires redaction. 65 P.S. § 67.902.

[3] Section 708(b)(11) provides that certain information, including confidential proprietary information and trade secrets, is exempt from disclosure under the RTKL. 65 P.S. § 67.708(b)(11).

[4] Pursuant to Section 1101(c)(1) of the RTKL:

[a] person other than the agency or requester with a direct interest in the record subject to an appeal under this section may, within 15 days following receipt of actual knowledge of the appeal . . . file a written request to provide information or to appear before the appeals officer or to file information in support of the requester's or agency's position.

65 P.S. § 67.1101(c)(1).

overall operations in the HealthChoices Program, Leonard regularly deals with confidential proprietary information and trade secrets, and he was personally involved in the preparation of the Agreement. (Leonard Affidavit ¶¶ 3-4, 8, Reproduced Record (R.R.) at 848a-49a.) Leonard included a table wherein he indicated the section/page number of the Agreement on which the redacted information may be found, generally described the redacted information, and stated that each item was exempted from disclosure under Section 708(b)(11) of the RTKL and under the UTSA as it had been "developed by Magellan, in consultation with [] County." (Leonard Affidavit ¶¶ 21-22, R.R. at 851a-52a.) Leonard contended that the redacted material involved "[c]onfidential components of [Magellan's] pricing formula, process and strategy" and/or "[c]onfidential pricing information and pricing method, process and strategy." (FOF ¶ 8 (quoting Leonard Affidavit ¶ 21, R.R. at 851a-52a).) Specifically, the Leonard Affidavit provided that the redacted information reflects:

> (a)    Confidential insurance information that is unique to Magellan's overall pricing formula and strategy;
>
> (b)    Components of Magellan's confidential pricing information and formula(s);
>
> (c)    Confidential proprietary business information and trade secrets which was the end result of Magellan's business strategy and methodology; and
>
> (d)    Confidential business information and data [which] is not publicly known or known to Magellan's competitors.

(Leonard Affidavit ¶ 23, R.R. at 852a-53a.) The Leonard Affidavit also detailed the steps Magellan generally takes to ensure certain information is kept confidential, including: designating such information as confidential at the time it submitted its

4

proposal to County; submitting a redacted proposal to County and relying on the confidential nature of County's review; allowing access to only certain individuals on a "need-to-know only basis" within Magellan; requiring employees of Magellan to attend training sessions annually regarding the treatment of confidential information and/or trade secrets and sign a statement of confidentiality to prohibit the disclosure of the same; and maintaining a code of conduct to safeguard sensitive information. (Leonard Affidavit ¶ 29, R.R. at 854a-55a.) Magellan's HealthChoices Program agreements with numerous counties are among those addressed by Magellan's confidentiality policies. (Leonard Affidavit ¶ 30, R.R. at 855a.)

Leonard also prepared a five-page Supplemental Affidavit (Supplemental Leonard Affidavit) in response to the OOR's request for additional information explaining why the redacted information should remain exempt from disclosure. (FOF ¶ 8.) Therein, Leonard incorporated the attestations he had made in his Affidavit and clarified the harm Magellan would suffer from disclosure as follows:

> 6. Here, Magellan's Proposal includes a number of specific pricing and other components that were presented and arranged in such a way in its Proposal and subsequently negotiated in the Agreement that Magellan considers confidential and proprietary in nature.
>
> 7. For example, once a specific pricing component or element was selected for inclusion in Magellan's Proposal, Magellan then decided how best to utilize the selected component not only in its Proposal, but in subsequent negotiations with the County now set forth in the Agreement.
>
> 8. The utilization and amount of each component that goes into Magellan's proposals and negotiation of pricing and cost structures is not generally known to Magellan's competitors.
>
> 9. If a competitor of Magellan, such as Optum, were to gain access to the components utilized by Magellan in creating its confidential proprietary and/or trade secret pricing strategy/formula, it could utilize

this information to replicate Magellan's confidential pricing formula and structure which would, in turn, cause substantial harm to Magellan's competitive position.

10.    If, for example, Magellan's competitors were to discover that Magellan offered a certain new product or staffing model as part of its overall confidential pricing strategy, they could then choose to include similar products or staffing model(s) within their proposals in an effort to undercut and substantially harm the competitive advantage of Magellan.

11.    Moreover, if a competitor were to gain access to the entire list of components used in Magellan's confidential pricing formula, such a competitor could utilize this information to create a separate future proposal substantially similar to Magellan's and substantially harm Magellan's competitive position in the market.

12.    The information redacted from the Agreement and at issue in this appeal includes these confidential components or elements as well as specific numeric amounts that were included in Magellan's Proposal submitted to [] County and incorporated into the Agreement following negotiations with [] County.

13.    In particular, the information redacted from page vi of the Agreement (Appendices) constitutes the individual components and structure of Magellan's pricing formula that Magellan used to win [] County's competitive process.

14.    The information redacted from page 4 (Section 1.3) of the Agreement constitutes a critical component of Magellan's pricing structure and formula that Magellan used to win [] County's competitive process.

15.    The information redacted from page 5 (Section 2.1.J) of the Agreement constitutes a critical component of Magellan's pricing structure and formula that Magellan used to win [] County's competitive process.

16.    The information redacted from page 9 (Section 2.3) includes the numeric percentage of the "Medical Cost Threshold" that is part of Magellan's confidential pricing strategy and formula.

6

17.     The information redacted from page 10 (Section 2.3) includes the dollar amount of the "Risk Attachment Point" that is part of Magellan's confidential pricing strategy and formula.

18.     The information redacted from page 14 (Section 3.2.A) includes the numeric percentage of the level of functionality of the computer network supporting the MIS that is part of Magellan's confidential pricing strategy and formula.

19.     The information redacted from page 16 (Section 3.2.G) includes the number of days following a request by [] County by which electronic data transfers will be completed that is part of Magellan's confidential pricing strategy and formula.

20.     The information redacted from page 28 (Section 8.1.A.2 (a-d)) includes that numeric percentages of "Net Department Payments" which are appropriated for each respective service/function that is part of Magellan's confidential pricing strategy and formula.

21.     The information redacted from page 28 (Section 8.1.A.3) includes the number of days following receipt of the "Net Department Payments" by which Magellan agrees to payment by [] County that is part of Magellan's confidential pricing strategy and formula.

22.     The information redacted from page 39 (Section 8.1.B.9.1.d) includes the percentage of the "Medical Cost Threshold" that is part of Magellan's confidential pricing strategy and formula.

23.     The information redacted from page 39 (Section 8.1.B.9.1.d(1)) includes the dollar amount of the "Risk Attachment Point" that is part of Magellan's confidential pricing strategy and formula.

24.     The information redacted from page 44 (Section 8.4) constitutes the components of Magellan's pricing structure and formula that Magellan submitted to win [] County's competitive process.

25.     The information redacted from page 72 (Section 18.1.A) includes the dollar amount of the fine which may be utilized as a sanction that is part of Magellan's confidential pricing strategy and formula.


(Supplemental Leonard Affidavit ¶¶ 6-25, R.R. at 884a-87a.)

7

On July 16, 2021, the OOR issued its Final Determination granting in part and denying in part Magellan's appeal. The OOR did not order Magellan to present an unredacted copy of the Agreement for *in camera* review, but stated it "had the benefit of being able to review the redacted copy of the responsive record." (OOR Final Determination (Final Determination) at 11, R.R. at 25a.) Relying on Leonard's affidavits as sufficient evidentiary support, the OOR found Magellan had proven the Agreement "is commercial or financial, as required to be confidential proprietary information." (Final Determination at 10, R.R. at 24a.) Although it upheld the majority of County's redactions to the Agreement, the OOR found Magellan had failed to prove that some redactions were necessary to protect confidential proprietary or trade secret information. The OOR directed County to provide Hancock a copy of the Agreement removing the redactions including: the title of appendices on page vi of the Agreement; the names of the title of appendices from within the Agreement following the "Appendices" page or references to those titles, page, and appendix numbers; references to Magellan's parent company; and the contents of Appendix 4 of the Agreement. (Final Determination at 11-12, R.R. at 25a-26a.) The OOR also noted that in its May 21, 2021 position statement, Magellan stated it would not pursue an argument that Appendix 4 and its contents are exempt under Section 708(b)(11) and, therefore, that information would be provided to Hancock without redactions. (*Id.*) The OOR further determined "the remainder of the redactions are proper as the exempt information is considered confidential proprietary information and/or trade secrets[] that are not considered financial records as defined under Section 708(c) of the RTKL." (Final Determination at 12, R.R. at 26a.) The OOR ordered County to provide all responsive records as directed in its Order within 30 days. (*Id.*)

8

## B.     *Proceedings Before Common Pleas*

Requesters filed a Petition for Review with common pleas on August 13, 2021.  Magellan filed a Petition to Intervene, which was granted on October 15, 2021.  The parties submitted briefs to common pleas, and on May 18, 2022, common pleas held oral argument.  In its order of May 19, 2022, common pleas directed County to submit a complete, unredacted copy of the Agreement to the court for *in camera* review.[5]  Magellan did not challenge common pleas' May 19, 2022 Order, and County complied.

Following its review of the entire record, including the complete Agreement *in camera*, common pleas issued a Memorandum and Order on July 6, 2022, in which it made Findings of Fact and Conclusions of Law (COL).  Common pleas characterized the material that the OOR had determined to be proper redactions under Section 708(c) of the RTKL as follows:

> 12.  As noted above, [common pleas] has reviewed *in camera* the unredacted version of the Agreement, including Appendices, submitted by the County.  That review discloses that the redactions that the OOR allowed to stand consist of:
>
> > a.      provisions stating the terms of payments to be made by [] County to Magellan, based on funding received by [] County from DHS, and fines for non-compliance by Magellan ("Payment Provisions");
> >
> > b.      provisions stating the metrics or standards for services to be provided by Magellan;
> >
> > c.      provisions for protection of [] County from insolvency or nonperformance by Magellan, including but not limited to provisions relating to the letter of credit and performance bond

---

[5] The Pennsylvania Supreme Court has stated that a court reviewing a determination of the OOR has the discretion to order the production of the disputed record for *in camera* review. *McKelvey v. Pa. Dep't of Health*, 255 A.3d 385, 412-13 (Pa. 2021).

to be posted by Magellan, cash reserves to be maintained by Magellan, and other protections;

  d. provisions in the event of an acquisition of Magellan or its parent; and

  e. provisions stating the terms of a covenant not to compete.

(FOF ¶ 12.)

Common pleas concluded the sole basis upon which the OOR had permitted County to redact the Agreement, and the only basis upon which County and Magellan relied in opposing Requesters' Petition for Review, was the exemption for a trade secret or confidential proprietary information under Section 708(b)(11). (July Opinion, COL ¶ 9.) However, under Section 708(c) of the RTKL, common pleas concluded the exemption under Section 708(b)(11) does not apply to financial records. (*Id.* ¶ 10.) Common pleas held the redacted Payment Provisions are part of a contract dealing with County's receipt or disbursement of funds and, therefore, constitute a financial record. (*Id.* ¶ 13.) Accordingly, pursuant to Section 708(c), these provisions are not exempt from disclosure under Section 708(b)(11), and it was not necessary to determine if, in the absence of Section 708(c), these Payment Provisions may qualify as a trade secret or confidential proprietary information. (*Id.*) Citing the aforementioned statutory law and the Pennsylvania Supreme Court's decision in *Department of Public Welfare v. Eiseman*, 125 A.3d 19, 32 (Pa. 2015), common pleas ultimately concluded that the claimed trade secrets were not exempt from disclosure pursuant to Section 708(c) of the RTKL and were not independently exempted from disclosure under the UTSA. (COL ¶ 12.) Accordingly, common pleas held that none of the redactions the OOR had permitted qualify for exemption under Section 708(b). (*Id.* ¶ 15.) Common pleas reasoned that

10

[t]he remaining redacted provisions . . . do not constitute trade secrets or confidential proprietary information under the definitions set forth in [S]ection 102 [of the RTKL, 65 P.S. § 67.102]. The contents of these provisions do not derive "independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use," and their disclosure would not "cause substantial harm to the competitive position of the person that submitted the information." [*Id.*]

(COL ¶ 14.) In its Order, common pleas reversed the OOR's Final Determination and directed County to provide Requesters with a complete and unredacted copy of the Agreement within 30 days.

On August 5, 2022, Magellan filed a timely notice of appeal, along with a Motion to Stay Enforcement of the Court's Order with common pleas. Also on that date, common pleas filed an order directing Magellan to file a Concise Statement of Errors Complained of on Appeal (Statement) pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b). Common pleas granted Magellan a stay pending this Court's final determination of Magellan's appeal on August 26, 2022. That same day, Magellan filed its Statement, and common pleas filed its Opinion Pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure (1925(a) Op.) on October 4, 2022. Therein, common pleas detailed how certain redacted provisions of the Agreement pertain to County's receipt and/or payment of funds. Common pleas explained this material constitutes financial records that are not exempted from disclosure under the exemptions for trade secrets or confidential proprietary information; thus, regardless of whether they qualify as trade secrets or confidential proprietary information, they must be disclosed. (1925(a) Op. at 7-11 (referencing Secs. 2.3, 8.1.A.2, 8.1.A.3, 8.1.B.8.a(1), 8.1.B.9.1.a(2), 8.1.B.9.1.d, 8.1.B.9.1.d(2)(i), 8.6, 8.7, and 18.1.A, and Appendices 5, 6, and 11of the Agreement (the Payment Provisions)) (citing Section 708(b)(11) and 708(c) of the RTKL, and

11

*Eiseman*).)  Specifically, common pleas expounded upon its previous factual findings and legal conclusions set forth in its July Opinion and explained that many of the contractual provisions that the OOR had permitted County to redact dealt directly with County's "receipt or disbursement of funds" as follows:

• Sec. 2.3:  In the definition of "Medical Cost Threshold," a percentage figure is redacted.  In the definition of "Risk Attachment Point" **a dollar amount is redacted**.  These defined terms are used in later provisions that set forth the **amount of payments** that [] County is to make to Magellan for its services. (*E.g*, [S]ecs. 8.l.A.1, 8.1.B.9.1.d(2)(i).)  The definitions therefore deal with the disbursement of funds by [] County.

• Sec. 8.1.A.2:  Section 8.1.A is titled "Provider [i.e., Magellan,] Payments; Capitation Payments."  The various subdivisions of this section set forth a **complex formula for calculating payments** to be made by [] County to Magellan for its services.  Under [S]ection 8.1.A.1, "[] County shall transfer to [Magellan] on a monthly basis a portion of the Net Department Payments [defined in [S]ection 2.3 to mean all DHS capitation payments to [] County less certain adjustments] equivalent to the Medical Cost Threshold for the payment of all Medical Costs [as also defined in section 2.3]."  Section 8.1.A.2 provides that the Net Department Payments received by [] County from DHS "shall be allocated between Medical Costs, Non-Benefit Load Costs, and other costs identified herein as follows[.]"  Subdivisions 8.1.A.2.a through d then set forth **the percentage of Net Department Payments to be allocated to Medical Costs, Magellan's administration, [] County's administrative costs, and an Incentive Pool**.  Each of the percentage figures in Subdivisions a through d is redacted.  These percentage figures directly relate to the receipt and disbursement of funds by [] County.

• Sec. 8.1.A.3:  This section provides that [] County "shall make the payment referred to in Section 8.1.A.2.a [Medical Costs, etc.] and 8.1.A.2.b [Magellan's administration]" within a specified number of days from [] County's receipt of the Net Department Payments.  The number of days is redacted, even though it deals with the receipt and disbursement of funds by [] County.

• Sec. 8.1.B.8.a(l):  Section 8.1.B.8 requires Magellan to post a Letter of Credit with [] County, upon which the County may draw in the event

12

of the "bankruptcy, insolvency, rehabilitation or liquidation" of Magellan.  The **required amount of the Letter of Credit is redacted**, even though the provision deals with the receipt of funds by [] County.

• Sec. 8.1.B.9.1.a(2):  Section 8.1.B.9, titled "Insolvency Protection," requires Magellan to post a Performance Bond, similar to the Letter of Credit in that [] County may draw upon it in the event of the "insolvency, bankruptcy, rehabilitation or liquidation" of Magellan. Like the Letter of Credit provision, the **amount of the Performance Bond is redacted,** even though it deals with the receipt of funds by the County.

• Sec. 8.1.B.9.1.d:  This provision reiterates **the percentage of Net Department Payments that constitutes the Medical Costs payable to Magellan**, as previously set forth in section 8.I.A.2.a. . . .  The percentage figure is redacted.

• Sec. 8.1.B.9.l.d(2)(i):  Section 8.1.B.9.l.d(2) states the formula for paying Medical Costs that exceed the Medical Costs Threshold.  Under subdivision (i), for Medical Costs up to the Risk Attachment Point, [] **County shall make payment** from its Risk and Contingency Fund **up to a specified dollar limit.  The amount of the limit is redacted.**  This amount addresses directly the payment of funds by [] County.

• Sec. 8.6:  This section addresses **how funds from DHS under its Pay for Performance (P4P) Programs shall be divided between Magellan and the County.**  Section 8.6.A provides for the percentage division of funds under the P4P Program that is part of DHS's Integrated Care Plan Program.  Section 8.6.B provides for the percentage division of funds under the P4P Program for behavioral health performance measures.  In both provisions, **the percentage figures are redacted,** even though they deal directly with the receipt and payment of funds by [] County.

• Sec. 8.7:  This section provides for **the circumstances under which an acquisition of Magellan would trigger the right of [] County to renegotiate "the financial terms contained in Section 8."  The section was redacted in its entirety.**  The section deals with "financial terms" of the Agreement, including the terms providing for the receipt and payment of funds by [] County.

• Sec. 18.1.A:  Section 18.1 provides for sanctions on Magellan for its noncompliance with any requirements under the Agreement.  Section

18.1.A provides for **fines of up to a specified dollar amount per day. The dollar amount is redacted**, even though it deals with the receipt and payment of funds by [] County.

• Appendices 5 and 6:  These appendices set forth the required forms of Letter of Credit and Performance Bond required under [S]ections 8.1.B.8 and 8.1.B.9 . . . .  They were withheld in their entirety.  The appendices deal with the receipt of funds by [] County to the same extent as the sections of the Agreement to which they correspond.[]

• Appendix 11:  This appendix is a **copy of a Guaranty by a third party** (related to Magellan) of the **performance and payment of all obligations of Magellan under the Agreement,** including Magellan's payment obligations.  It thus deals with the receipt and payment of funds by [] County.  The appendix was withheld in its entirety.

(1925(a) Op. at 7-10 (footnote omitted) (emphasis added).)

Common pleas further found the remaining redactions that the OOR had permitted were improper because neither of Leonard's affidavits nor other record evidence established they constitute trade secrets or confidential proprietary information as defined in Section 102 of the RTKL.  (*Id*. at 12-13 (referencing Secs. 3.2.A, and 3.2.G, and Appendices 2, 7, and 8-9).)  Common pleas described these redactions as follows:

• Sec. 3.2.A:  This section addresses the management information system to be operated by Magellan.  It includes a representation and warranty by Magellan that its computer network will comply with functionality requirements for a specified percentage of the "Scheduled Uptime."  The percentage is redacted.

• Sec. 3.2.G:  This section requires Magellan to provide the County with an electronic transfer of all data necessary to monitor the Agreement, within a specified number of business days from a request by [] County.  The number of days is redacted.

• Appendix 2:  This appendix incorporates Program Standards and Requirements [(PSR)] issued by DHS.  It was withheld in its entirety.[]

14

• Appendix 7: This appendix is a letter from DHS to [] County approving solvency requirements for the HealthChoices Behavioral Health Program. It contains no financial information and no other details on how the requirements have been met. The appendix was withheld in its entirety.

• Appendices 8 and 9: These appendices are copies of insurance policies maintained by Magellan. Although they set forth the monetary limits of coverage, they do not disclose any sensitive information regarding Magellan. The appendices were withheld in their entirety.

(*Id.* at 12-13 (footnote omitted).)

Common pleas concluded:

[T]he very nature of the redacted information – the percentage of time that Magellan's computer network is required to be functional, the time within which Magellan must comply with a County request for an electronic data transfer, [PSR] *issued by DHS*, a conclusory approval by DHS of solvency requirements, and copies of policies issued by third-party insurance companies – is wholly unrelated to any need to protect Magellan from competitive harm resulting from their disclosure. It is difficult to see, and [ ] Leonard does not explain, how the disclosure of this information would give a competitive edge to Optum or any other service provider in seeking a future contract with the County when it puts out the HealthChoices Behavioral Health Program services for rebid in the future. Such information is thus very different from the pricing and compensation information and similar financial terms discussed above – information that might well be useful to a competitor, but which nevertheless, must be disclosed as "financial records" under [S]ection 708(c).

(1925(a) Op. at 13 (emphasis in original).)[6]

---

[6] Common pleas stated that a bill is pending before the Pennsylvania Senate that would, *inter alia*, amend the RTKL by adding trade secrets and confidential proprietary information under Section 708(b)(11) to the list of exemptions from mandatory disclosure of financial records under Section 708(c). (1925(a)) Op. at 11 n.8 (citing S.B. 492, sec. 7, 206th Gen. Assemb. (Pa. 2022).)

## II.    ISSUES

On appeal, Magellan presents the following four issues for review: (1) whether common pleas erroneously and summarily categorized redactions within the Agreement as "financial records" in violation of Section 102 of the RTKL; (2) whether as a result of its error common pleas improperly applied Section 708(c) of the RTKL to deny Magellan the ability to protect its confidential proprietary and/or trade secret information pursuant to the exemption set forth in Section 708(b)(11) of the RTKL; (3) whether common pleas' Order violates Sections 306 and 3101.1 of the RTKL, 65 P.S. §§ 67.306, 67.3101.1, because its application and interpretation of Section 708(c) of the RTKL conflicts with the UTSA; and (4) whether common pleas' Order constitutes an abuse of discretion and a violation of Section 708(b)(11) where it summarily concluded that certain redactions do not constitute confidential proprietary and/or trade secret information that is exempt from disclosure.  (Magellan's Brief (Br.) at 5.)

## III.    DISCUSSION

When reviewing a trial court's order in a RTKL matter, this Court determines whether the trial court's findings of fact are supported by substantial evidence or whether it committed an error of law or an abuse of discretion in reaching its decision.  *Butler Area Sch. Dist. v. Pennsylvanians for Union Reform*, 172 A.3d 1173, 1178 n.7 (Pa. Cmwlth. 2017).  "The scope of review for a question of law under the [RTKL] is plenary."  *SWB Yankees LLC v. Wintermantel*, 999 A.2d 672, 674 n.2 (Pa. Cmwlth. 2010) aff'd, 45 A.3d 1029 (Pa. 2012) (citation omitted). The objective of the RTKL is to empower citizens by affording them the access to information concerning governmental activities.  *McGowan v. Pa. Dep't of Env't Prot.*, 103 A.3d 374, 380 (Pa. Cmwlth. 2014) (citation omitted).  This Court must

16

"liberally construe the RTKL to effectuate its purpose of promoting 'access to official government information in order to prohibit secrets, scrutinize actions of public officials, and make public officials accountable for their actions.'" *Levy v. Senate of Pa.*, 65 A.3d 361, 381 (Pa. 2013) (quoting *Allegheny Cnty. Dep't of Admin. Servs. v. A Second Chance, Inc.*, 13 A.3d 1025, 1034 (Pa. Cmwlth. 2011)). Consistent with the RTKL's remedial nature and goal of promoting government transparency, the exemptions to disclosure of public records must be construed narrowly. *Pa. Dep't of Educ. v. Bagwell*, 114 A.3d 1113, 1122 (Pa. Cmwlth. 2015). With the foregoing in mind, we turn to the merits of the parties' arguments.

> A. *Whether common pleas erred in categorizing redactions within the Agreement as "financial records" in violation of Section 102 of the RTKL*

> 1. <u>Parties' Arguments</u>

Magellan first argues common pleas' Order should be reversed because it incorrectly categorized certain individual redactions within the Agreement as financial records, in violation of the plain statutory language of Section 102 of the RTKL and the facts of the case. (Magellan's Br. at 19.) For example, common pleas characterized redacted information to be "Payment Provisions" that constituted a financial record without concomitantly finding the entire Agreement itself to be a financial record. (*Id.* at 22-23.) While Magellan does not dispute that the Agreement is a "record" for purposes of the RTKL, it claims the individual redactions to the Agreement do not constitute an account, voucher, or contract and, thus, cannot constitute a financial record under the RTKL, as common pleas held. (*Id.* at 25-26.) Magellan stresses that the Agreement does not include the amount of public monies County is to disburse to Magellan, which is the "entire purpose" of a financial record. (*Id.* at 26.) Moreover, common pleas' characterization of specific redacted

17

information contained within the larger Agreement as financial records, or Payment Provisions without defining those specific provisions, violates the plain language of Section 708(c). (*Id*. at 26-27.) Because Section 708(c) permits an agency to redact limited information from a financial record, but only related to certain 708(b) exemptions, to separately categorize information redacted from a larger document itself as a financial record renders Section 708(c) inoperable, which would be an absurd result. (*Id*. at 23.)

According to Magellan, even if the Agreement is deemed to constitute a financial record, information protected from disclosure under a Section 708(b) exemption does not lose its protection simply because it later becomes part of a contract. Magellan initially submitted the now-redacted information as part of its Proposal to County. At that time, Magellan believed the confidential, proprietary pricing and trade secret information and formulas it had generated would be more advantageous to County than the pricing models and formulas Magellan's competitors might present. When County selected Magellan to provide HealthChoices Program services to Medicaid recipients in County, the confidential proprietary information was then incorporated into the negotiated Agreement, but this fact does not mean that the information loses its exempt status. (*Id*. at 28, 31-32 citing *Global Tel\*Link Corp. v. Wright*, 147 A.3d 978 (Pa. Cmwlth. 2016) (*GTL*), and *UnitedHealthcare of Pa., Inc. v. Baron*, 171 A.3d 943 (Pa. Cmwlth. 2017).)

Requesters respond that Magellan's argument is premised upon a mistaken view that if an entire document cannot be produced as a financial record, then none of it can be. (Requesters' Br. at 14.) To the contrary, Requesters argue the plain language of the RTKL does not require an entire agreement to be deemed a financial record, and to the extent an otherwise public document or record is a hybrid of

18

exempt and non-exempt information, the RTKL provides for partial redactions. (*Id.* at 14-15.) However, under the definition of financial records as interpreted in *Eiseman*, common pleas correctly determined that the Payment Provisions at issue herein are financial records. (*Id.* at 10-11.) Requesters reason that the Agreement is a contract for managed-care services between Magellan and County, and a contract for services, or a contract dealing with the "disbursement of funds by an agency," constitutes a financial record under Section 102. (*Id.* at 11 (quoting 65 P.S. § 67.102).) As common pleas discussed, each of the redacted Payment Provisions contains information dealing with the agency's disbursement of public funds, and therefore, qualifies as financial records under *Eiseman*. (*Id*. at 13.) Even though the Agreement is not labeled a contract, when read in its entirety, it is plainly a financial record. The redacted portions are part of a description of rates and dollar amounts to be paid to Magellan, a government contractor, making it a record dealing with a government agency's, County, disbursement of public funds as part of its responsibility to afford access to healthcare services in furtherance of the public interest. (*Id*. at 16-19 (citing *Eiseman*, 125 A.3d at 33).) Requesters further argue that *GTL* and *Baron* are distinguishable.[7]

In its Reply Brief, Magellan asserts Requesters' reading of *Eiseman* would require that "any record bearing the slightest relation to an agency's purchase or receipt of funds or goods must be considered a 'financial record.'" (Magellan's Reply Br. at 4.) Although Magellan agrees that partial redactions to an otherwise public document are appropriate under the RTKL, it reiterates the Agreement itself is not a financial record. The express terms of Section 708(c) require that a "financial record" be defined as the entire record, not individual redactions, and any

---

[7] In its letter filed with this Court on March 6, 2023, County indicated it did not intend to file a brief and would not otherwise be participating in this appeal.

19

other interpretation of the statute renders that section nonsensical.  (*Id*. at 6-7.)  A "record" that does not contain the amount of funds to be paid to a service provider cannot also be a "financial record."  (*Id*. at 12.)

### 2. Analysis

There is no dispute that the Agreement, and the provisions at issue, are "records" under the RTKL.  Section 102 of the RTKL broadly defines a "[r]ecord" as:

> Information, regardless of physical form or characteristics, that documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency.  The term includes a document, paper, letter, map, book, tape, photograph, film or sound recording, information stored or maintained electronically and a data-processed or image-processed document.

65 P.S. § 67.102.  However, the term "[f]inancial record" is defined separately as:

> Any of the following:
>
> (1) **Any** account, voucher or **contract dealing with**:
>
> > (i) the receipt or disbursement of funds by an agency; or
> >
> > (ii) an agency's acquisition, use or disposal of services, supplies, materials, equipment or property.
>
> (2) The salary or other payments or expenses paid to any officer or employee of an agency, including the name and title of the officer or employee.
>
> (3) A financial audit report.  The term does not include work papers underlying an audit.

*Id*. (emphasis added).

20

The RTKL provides for certain exemptions to the general rule that public records are subject to access. 65 P.S. § 67.708(b). Specifically, as relevant here, Section 708(b)(11) of the RTKL states:

> **(b) Exceptions.--**Except as provided in subsections (c) and (d), the following **are exempt** from access by a requester under this act:
>
> . . . .
>
> (**11**) **A record that constitutes or reveals a trade secret or confidential proprietary information**.

65 P.S. § 67.708(b)(11)(emphasis added). Section 708(c), thereafter, provides:

> **(c) Financial records.--**The exceptions set forth in subsection (b) shall **not apply to financial records**, except that an agency may redact that portion of a financial record protected under subsection (b)(1), (2), (3), (4), (5), (6), (16) or (17). An agency shall not disclose the identity of an individual performing an undercover or covert law enforcement activity.

65 P.S. § 67.708(c)(emphasis added).

Thus, while records that would disclose a trade secret or confidential proprietary information are generally exempted from public access, 65 P.S. § 67.708(b)(11), "if those records may be categorized as 'financial records,' they are nonetheless **subject to full disclosure (and may not be redacted),** regardless of whether they would reveal [those trade secrets or confidential proprietary information], unless otherwise provided by law," *City of Harrisburg v. Prince,* 219 A.3d 602, 606 (Pa. 2019) (emphasis added). For this reason, the question as to "whether a given public record is a financial record is potentially outcome determinative in terms of the public's ability to access and inspect it." *Id.*

21

With respect to establishing exemptions, the RTKL provides that "[t]he burden of proving that a record of a Commonwealth agency or local agency is exempt from public access shall be on the Commonwealth agency or local agency receiving a request by a preponderance of the evidence." 65 P.S. § 67.708(a)(1); *Allegheny Cnty. Dep't of Admin. Servs. v. Parsons*, 61 A.3d 336, 342 (Pa. Cmwlth. 2013). "The RTKL does not allow an agency to delegate its disclosure duty or burden of proof to third parties. Furthermore, it is presumed that Commonwealth agencies will act in good faith in discharging their statutory duties under the RTKL." *McKelvey v. Pa. Dep't of Health*, 255 A.3d 385, 401 (Pa. 2021) (citing *Off. of Governor v. Donahue*, 98 A.3d 1223, 1239 (Pa. 2014)). The agency may meet this burden of proof through a sworn affidavit. *GTL*, 147 A.3d at 980.

Magellan argues that common pleas abused its discretion in finding the Payment Provisions grouped together but "standing alone" comprised an independent financial record without analyzing whether the Agreement, in toto, is a financial record. Magellan reasons that the Agreement cannot be deemed a financial record because it does not enumerate the full amount County remits to Magellan. (Magellan's Br. at 21-26.) However, Magellan's arguments mischaracterize common pleas' determination. Common pleas did not find that the redacted Payment Provisions and related appendices comprised a negotiated contract separate and apart from the Agreement, but rather, determined that the Payment Provisions, which appear in the Agreement reached between Magellan and County, were "provisions of a 'contract dealing with . . . the receipt or disbursement of funds' by [] County and therefore constitute a 'financial record.'" (July Opinion, COL ¶ 13.) Moreover, even if we were to view the Payment Provisions in isolation, following our own *in camera* review, we would find they are not protected under the Section

22

708(b)(11) exemption for the reasons the trial court set forth as they deal with County's receipt and disbursement of funds. (1925(a) Op. at 7-10.) Following its *in camera* review of the unredacted Agreement, common pleas reasoned the redacted segments of the Payment Provisions dealt with the County's receipt and disbursement of funds as per the terms of the Agreement. Common pleas further found the remaining redactions did not qualify as trade secrets or confidential proprietary information and, thus, were not exempt from disclosure under Section 708(b)(11) and stated that some of the redactions did not even pertain to Magellan. (July Opinion, COL ¶ 14.) Common pleas detailed how each of the redactions encompassed in the Payment Provisions pertained to exchanges of monies between Magellan and County regarding amounts of payments, potential bonuses and fines, required credit, and bond documents. (1925(a) Op. at 7-11.) Common pleas then expressed that neither of Leonard's affidavits nor other record evidence submitted to the OOR evinced how the remaining redactions could be considered trade secrets or confidential proprietary information. (*Id.* at 12-13.)

Although common pleas considered the nature of the redacted provisions without specifically finding whether the Agreement as a whole is a financial record, Requesters argue such an analysis was not necessary because the Agreement is a financial record subject to Section 708(c). Applying the term "financial record" as it was interpreted in *Eiseman*, we agree that the Agreement falls under the definition of a financial record as it is a contract dealing with the receipt or disbursement of funds.

The Pennsylvania Supreme Court first considered the definition of a "financial record" following the passage of the RTKL in *Eiseman*. Therein, the disputed issue before the Supreme Court was whether documents in the possession

23

of the Department of Public Welfare (DPW), which reflected rates paid to dental subcontractors by private MCOs pursuant to contracts into which DPW had entered with the MCOs to provide dental services to Medicaid recipients, constituted contracts dealing with the disbursement of funds by an agency. *Eiseman*, 125 A.3d at 29-30. Referencing its prior decision in *North Hills News Record v. Town of McCandless*, 722 A.2d 1037, 1039 (Pa. 1999), which held the terms "accounts, vouchers or contracts" included records that "'bear a sufficient connection' to such fiscally-related categories,'" the Supreme Court in *Eiseman* determined that a record may **deal with** the disbursement of funds by an agency even where it does not directly show a disbursement by that agency. *Eiseman*, 125 A.3d at 30. As such, the Supreme Court held that records reflecting the rates paid by the MCOs to the subcontractors were "financial records" as that term is defined in the RTKL because they were "dealing with" contracts that disbursed public monies for essential healthcare services from DPW to the service providers. *Id.* at 31-32.

More recently, in *Prince*, the Supreme Court stated that the "account, voucher or contract" category must be **construed broadly** under the current iteration of the RTKL so as

> to effectuate expanded access to information about the activities of government. *See* [Sections 1921 and 1922 of the Statutory Construction Act of 1972 (SCA),] 1 Pa.C.S. §§ 1921, 1922. Thus, we need not settle on a single definition of "account." Rather, we conclude, as we did in [*Pennsylvania State University v. State Employees' Retirement Board,* 935 A.2d 530 (Pa. 2007)], that the term has multiple acceptable definitions, including "a list or enumeration of financial transactions" and a "record of debit and credit entries, as well as monetary receipts and disbursements." *Id*. [at 535.]

> Moreover, consistent with our cases, to satisfy the statutory definition of financial record, the [record at issue] need only bear a close connection to an account.

*Prince*, 219 A.3d at 615-16.

Although Magellan argues to the contrary, from the intentions of the parties as expressed in the preamble to the Agreement, it is evident that the Agreement satisfies the requirement that a financial record is a "contract dealing with . . . the receipt or disbursement of funds by an agency", 65 P.S. § 67.102:

> WHEREAS, COUNTY and [MAGELLAN], as COUNTY's Behavioral Health [MCO] entered into an Agreement, effective January 1, 2016, as Amended by Amendments No. 1 through No. 4, effective January 1, 2020 (collectively, the "COUNTY-[MAGELLAN] Agreement"), whereby [Magellan] provides and delivers services to the COUNTY and the HealthChoices Program, as required in the PSR and the COUNTY-DHS Agreement;
>
> WHEREAS, the Parties desire to amend and restate in its entirety the COUNTY-[MAGELLAN] Agreement, and any agreement relating to the Program that has not otherwise expired or terminated shall be superseded and replaced in its entirety by this Agreement;
>
> WHEREAS, **the foregoing recitations are essential elements of the contractual relationship and are contractual in themselves**;
>
> NOW, THEREFORE . . . .
>
> SECTION 1:    RELATIONSHIP AND INTENTIONS OF THE PARTIES
>
> 1.1    The purpose of this Agreement is to set forth the terms of the relationship between COUNTY, as the Primary Contractor with DHS, and [Magellan], to serve as COUNTY's Commonwealth licensed Behavioral Health [MCO] or "BH-MCO."  Pursuant to the PSR and the COUNTY-DHS Agreement, **[Magellan] is prepared to (i) assume, satisfy and discharge all liabilities and obligations of COUNTY under the COUNTY-DHS Agreement** (except as otherwise herein provided); (ii) to indemnify COUNTY as further set forth herein; and (iii) to provide and deliver the [medical assistance] Behavioral Health Services contemplated in the PSR, and the COUNTY-DHS Agreement. While COUNTY retains ultimate responsibility to DHS for compliance

25

with the HealthChoices Program and its fiscal requirements, it does hereby transfer to [Magellan], and [Magellan] hereby accepts, all potential adverse financial risks inherent in performing [Magellan's] duties and carrying out its responsibilities hereunder including, without limitation, **responsibility for the costs of services provided pursuant to the PSR in excess of capitation payments received by [Magellan] hereunder**. **[Magellan] agrees to accept as its sole compensation the compensation set forth in Section 8.1.A.2. herein**. COUNTY also specifically conditions all obligations and payments to [Magellan] under this Agreement upon the fulfillment by DHS of its obligations and payment responsibilities to COUNTY under the COUNTY-DHS Agreement. [Magellan] acknowledges and agrees that it has no right to receive payment from COUNTY apart from its rights under this Agreement.

1.2    As of the Effective Date and subject to the terms and limitations set forth in this Agreement, [Magellan] retains and assumes all of COUNTY's risk, liability and responsibility under the HealthChoices Program and pursuant to the PSR, the COUNTY-DHS Agreement as COUNTY's BH-MCO, and as otherwise described herein; and [Magellan] hereby stands behind and affirms its undertakings herein, including the undertakings of all entities with which [Magellan] **subcontracts** for [its] obligations hereunder.

(Agreement at 2-4, R.R. at 68a-71a (emphasis added).)

When entering into the Agreement, County and Magellan set forth the terms and conditions under which funds for the HealthChoices Program would be disbursed for those county residents in need of such medical services. As common pleas explained, the redactions from the Payment Provisions which the OOR had permitted to stand detailed the payments County was to remit to Magellan based on funding County received from DHS and fines for non-compliance on the part of Magellan; the standards by which Magellan was to provide services; details relating to, *inter alia*, the cash reserves Magellan was to retain and the letter of credit and performance bond Magellan was to post to protect County from Magellan's insolvency or nonperformance; discussion regarding a possible acquisition of

26

Magellan or its parent; and details concerning a covenant not to compete. (FOF ¶ 12.) Under Section 102 of the RTKL, each of these Payment Provisions deals with "disbursements of public money and services acquisitions by agencies." *Eiseman*, 125 A.3d at 29 (citations omitted). In *Eiseman*, the Court held that "subcontracts containing MCO Rates plainly 'deal with' DPW's disbursement of billions of dollars of public monies to provide access to essential healthcare to vulnerable populations, as well as [DPW's] acquisition of services to meet its own obligations under federal and state law (albeit through middlemen)." *Id.* at 30 (citing 65 P.S. § 67.102). In *Prince*, the Supreme Court reinforced its broad reading of the term "financial record" in *Eiseman*, stating "records bearing a sufficiently close connection to such 'fiscally[-] related' categories," such as accounts, vouchers, and contracts, are financial records "so long as they also 'deal with the receipt or disbursement of funds by an agency.'" *Prince*, 219 A.3d at 612 (quoting *LaValle v. Off. of Gen. Counsel*, 769 A.2d 449, 456 (Pa. 2001), and *N. Hills News Record*, 722 A.2d at 1039).

Magellan argues that common pleas' reliance upon *Eiseman* was in error and urges that this Court's holdings in *GTL* and *Baron* are dispositive herein. In *GTL*, this Court held an otherwise exempted document under Section 708(b), relating to the financial capability of a bidder to perform the contracts and which is **voluntarily appended** to the subsequently executed contract by the agency but was **not actually part of the contractual terms**, is not automatically transformed into a financial record that must be disclosed under the RTKL because it had been appended to the contract. 147 A.3d at 981. The Court distinguished such a situation from that in *Eiseman* by reasoning "GTL's submission of its [f]inancial [r]ecords to [the Department of Corrections] did not involve the disbursement of funds of the acquisition of services. Rather, the [f]inancial [i]nformation was submitted to show

27

GTL's economic capability to perform should it receive the . . . contracts." *Id.* In *Baron*, the requester asked DHS to disclose the rates it had paid to MCOs participating in Medicaid. 171 A.3d at 946. Relevant herein, the requested rates were not contained in the contracts between the MCOs and DHS but were separately negotiated between private parties. *Id.* at 961. This Court stressed that the purpose of allowing access to only those records that are directly related to the performance of a governmental function was to "prevent[ ] access to records that may relate to the contract but do not relate to its performance." *Id.* at 963. Thus, the salient consideration concerned "whether the information sought had a direct bearing on the third-party contractor's obligations" under its contract with the agency, and, therefore, constituted a financial record of the agency. *Id.* at 964. We reasoned that the requested rates did not relate directly to DHS's performance of its governmental function under the HealthChoices contract pursuant to Section 506(d)(1) of the RTKL, 65 P.S. § 67.506(d)(1), because DHS's knowledge of those rates was not necessary for it to assure compliance with the contract. *Id.* There was no record evidence that DHS utilized the rate information to monitor compliance with or otherwise oversee the contract, and, in fact, DHS administered the medical assistance program without that information; therefore, we remanded the matter to the OOR to determine whether there was a direct relationship between the rates and the MCO's performance of the contract. *Id.*

Unlike the situations presented in *GTL* and *Baron*, the Payment Provisions and other redacted material set forth in the Agreement herein were not appended thereto to show financial fitness or separately negotiated between two private parties. Rather, the redacted provisions set forth Magellan's and County's **reciprocal obligations** under the Agreement and are inextricably bound therewith. As Leonard

28

acknowledged in his Supplemental Affidavit, Magellan's rates were disclosed to County as part of the negotiation process. (Supplemental Leonard Affidavit ¶¶ 6-7, 12, R.R. at 884a-85a.) Prior to their acceptance, these terms and necessary accompanying documents had to be submitted to County for the possibility of further negotiation and approval in formalizing the Agreement. Moreover, the record is clear that these terms were part of the negotiation process, and the Agreement itself indicates its purpose is to set forth the terms through which Magellan is to provide and deliver services to County and the HealthChoices Program as required by the PSR and County. The redacted provisions directly relate to County's receipt of funds, the payments County is to make to Magellan for its services, the sanctions to be imposed if Magellan fails to comply with any requirements under the Agreement, and the steps Magellan must take to ensure its solvency. In light of the foregoing, we find the Agreement constitutes a financial record as its general terms and the Payment Provisions in particular are part of a contract of a local agency and have a direct bearing on the disbursement of funds by that agency.

> B. *Whether common pleas erred in ordering Magellan to reveal confidential proprietary and/or trade secret information*

### 1. Parties' Arguments

Magellan next asserts that, without analysis, common pleas summarily disregarded both County's and the OOR's determinations and failed to consider the confidential proprietary and/or trade secret nature of the pricing information and formula(s) in the Agreement it incorrectly deemed to be financial records. (Magellan's Br. at 33-34.) Magellan argues that as Leonard's affidavits verify, the redacted information amounts to sensitive business information, which is the product of Magellan's business strategy and/or confidential data, pricing methodologies, and

29

formulas that Magellan's internal policies and procedures seek to protect. (*Id*. at 35-36.) This information derives independent economic value from not being known by competitors such as Optum, and, if disclosed, would substantially harm Magellan's competitive position in the market with other MCOs. (*Id*. at 37-39.) Thus, Magellan concludes the redacted information is exempt from public disclosure under Section 708(b)(11) of the RTKL, and common pleas abused its discretion in finding otherwise without sufficient analysis. (*Id*. at 39-40.)

Requesters repeat that the Agreement is a financial record which County must release in its entirety. Even if this were not the case, Magellan has failed to meet its burden of proving that the Agreement contains confidential proprietary and/ or trade secret information. (Requesters' Br. at 20.) Critically, according to Requesters, Leonard admitted in his Affidavit that the financial information and formulas were never confidential within Magellan but, instead, were developed "in consultation with [] County[.]" (*Id*. at 21 (quoting Leonard Affidavit ¶ 22, R.R. at 852a).) Requesters argue that Leonard did not speak about the steps Magellan had taken to keep the information confidential during the negotiation/consultation process and instead described only the steps taken to do so thereafter. For this reason alone, Requesters reason, Magellan cannot prove the redacted information constitutes trade secrets within the meaning of the RTKL. (*Id*. at 21-22.) Requesters also cite to decisions of the Pennsylvania Supreme Court, which caution against reliance on affidavits absent *in camera* review. (*Id*. at 22 (citing *McKelvey*, 255 A.3d at 412, and *Am. Civ. Liberties Union of Pa. v. Pa. State Police*, 232 A.3d 654, 670 (Pa. 2020)).).)

Requesters also argue that some of the redacted percentages in the Payment Provisions from Section 8.1.A.2 do not even pertain to Magellan. For example,

"[t]here is no justification for withholding how [] County — a public entity — allocates payments it receives from [DHS], another public entity." (Requesters' Br. at 25.) Similarly, Requesters state that Sections 8.1.A.2.a, 8.1.A.2.b, and 8.1.A.2.d pertain only to government spending, which the public has a right to know. (*Id*. at 26.) Requesters argue Appendix 2 entitled "Program Standards and Requirements – Primary Contractor," which County withheld in its entirety, apparently contains the requirements, terms, and conditions by which Magellan must operate as an MCO in County. As these standards were created by DHS and appear to be the same document published on DHS's website, they should be produced in their entirety. (*Id*. at 27 n.4.) In addition, Appendix 3, which also was withheld, is titled "Performance Indicators" and enumerates the standards by which Magellan agreed to "perform and report." (*Id*. at 27.) Requesters argue that such information cannot be deemed confidential as County or DHS, not Magellan, creates the standards by which Magellan's performance is measured, and the public has a legitimate interest in knowing the manner in which a company that performs important public services is evaluated. (*Id*. at 27-28.)

In its Reply Brief, Magellan posits neither the Agreement itself nor the limited redactions therefrom are financial records, but rather all of the redactions constitute confidential proprietary and/or trade secret information. (Magellan's Reply Br. at 13.) Magellan asserts that pursuant to well-established caselaw, Leonard's affidavits sufficiently establish the confidential proprietary and/or trade secret status of the redactions, and common pleas' determination regarding the Agreement should not be afforded more weight simply because it conducted an *in camera* review of the Agreement. (*Id*. at 13-16.) Magellan's effort to develop the confidential pricing information contained in Section 8.1.A.2 required Magellan to exercise its business

judgment and discretion to determine the rates and conditions that it included in its Proposal to County to provide the HealthChoices Program services and which would eventually become the salient components and their proportions set forth in the Agreement. (*Id*. at 18-19.) Magellan likens this process to an "award winning 'secret sauce'" or trade secret which is the product of Magellan's experienced business judgment and is necessarily exempt from disclosure under the RTKL. (*Id*. at 18-21.) Magellan points out that Appendix 2 is a public document, which was not attached to the Agreement but merely referenced therein, and Requesters could have obtained this information at any time. (*Id*. at 22.) Magellan further explains that it exclusively developed the pricing and incentive programs and metrics set forth in Appendix 3, and like the percentage numbers, these programs and metrics are Magellan's confidential proprietary and/or trade secret information and their disclosure will substantially harm its ability to compete in the HealthChoices Program market. (*Id*. at 23-24.)

2. Analysis

In *Eiseman*, the Supreme Court stated "it is essentially undisputed that Section 708(c) renders the [RTKL]'s own internal trade-secrets/confidential-proprietary-information [exemption] inapplicable." 125 A.3d at 32. Section 708(c) does not authorize County to redact "[a] record that constitutes or reveals a trade secret or confidential proprietary information" of Magellan because the "internal trade-secrets confidential proprietary information" exemption in Section 708(b)**(11) is not included** in the limited list of exemptions applicable to financial records that may be redacted. 65 P.S. § 67.708(b)(11), (c) (stating "an agency may redact that portion of a financial record protected under subsection (b)(1), (2), (3), (4), (5), (6), (16), or (17)"). The General Assembly sought to ensure the disclosure of financial records

32

through Section 708(c), including some information which may have otherwise been considered a trade secret or confidential proprietary information, even if that information might have been exempt from disclosure if not in a financial record. Thus, an agency may **not** redact from financial records information which may have otherwise been withheld as a trade secret. *Prince*, 219 A.3d at 618; *Eiseman*, 125 A.3d at 32. In light of our finding that the Agreement in which the redacted paragraphs and appendices appear constitutes a financial record, the exemption in Section 708(b)(11) of the RTKL does not apply. For this reason, we need not address whether the redactions other than the Payment Provisions would qualify as trade secrets or confidential proprietary information under the RTKL. Notwithstanding, were we to do so, we agree with common pleas that these other redactions, which pertain to such items as Magellan's computer network and insurance policies, and DHS program standards and solvency requirements, are not exempted from disclosure under those exemptions. Thus, we next turn to a consideration of whether, as Magellan argues, the UTSA protects the redacted information in the Agreement from disclosure.

C. *Whether common pleas' interpretation of Section 708(c) in its July 6, 2022 Order is in direct conflict with the UTSA and in violation of Sections 306 and 3101.1 of the RTKL*

1. Parties' Arguments

Magellan next posits that even if this Court were to determine common pleas correctly found that the Section 708(b)(11) exemption does not apply to certain redacted information at issue herein, the pricing information and formula(s) contained in the Agreement are, nevertheless, exempt from disclosure under the UTSA, and common pleas abused its discretion in deciding otherwise. Pursuant to Sections 306 and 3101.1 of the RTKL, the provisions of the RTKL are rendered

inapplicable where they conflict with any other federal or state law. (Magellan's Br. at 42.) As such, Magellan posits that the instant matter is distinguishable from the situation presented in *Eiseman*. Magellan argues the *Eiseman* holding was limited to its facts, and the instant matter is controlled by this Court's later decision in *Baron* wherein we held, *inter alia*, that rates which had not been submitted to and approved by the agency were not subject to the Section 708(c) exemption or the Supreme Court's ruling in *Eiseman*. (*Id.* at 42-43.) Magellan reasons that the Agreement does not contain the rates paid to Magellan, but rather contains trade secret pricing information that Magellan submitted as part of a confidential proposal, and the amount paid to Magellan under the Agreement cannot be ascertained from the redacted information from the Agreement. (*Id.* at 43-44.)

Requesters state Magellan's present argument in support of this issue is in direct contradiction with representations Magellan previously made before common pleas that the Agreement contains "rates and conditions which are now set forth in Section 8.1.A.2." (Requesters' Br. at 29-30 (citing Magellan's Brief in Opposition to Requesters' Petition for Review at 29, R.R. at 1236a).) Requesters posit *Eiseman* controls this issue, for its reference to the applicability of its decision in "this instance" was not tied only to the existence of "rates." (*Id.*)

Magellan counters that *Eiseman*'s analysis in regard to the interplay between the UTSA and the RTKL is inapplicable herein. Magellan argues that, unlike the situation in *Eiseman*, where the requested records contained certain payment rates, the redacted information in the Agreement pertains only to Magellan's confidential proprietary and/or trade secret information that does not reflect any specific payments Magellan is to receive. (Magellan's Reply Br. at 24-25.) Magellan reasons that notwithstanding Requesters' arguments to the contrary, "the non-

inclusion of rates in the Agreement between Magellan and County limits any applicability which *Eiseman* may have here and certainly undercuts any argument that the []UTSA would not apply to protect Magellan's trade secret information from being disclosed." (*Id.* at 25.) Magellan also posits the General Assembly's failure to include Section 708(b)(11) among the categories of permissible redactions to financial records found in Section 708(c) does not evince its clear intent to override the trade secrets exemption in the financial records provision of the RTKL, but rather, may have been an oversight. Magellan emphasizes that there is currently a bill in the Legislature that would add Section 708(b)(11) to the list of permissible Section 708(b) redaction categories within a financial record pursuant to Section 708(c). (*Id.* at 25-26 & n.3.)

2.     Analysis

This issue concerns the interplay between the UTSA and the RTKL. We begin with this Court's recent discussion of the manner in which the RTKL is to be read with other legislation:

> The RTKL mandates that a Commonwealth agency or a local agency "shall provide public records in accordance with" the RTKL without regard to a requester's "intended use of the public record . . . unless otherwise provided by law." Sections 301 and 302 of the RTKL, 65 P.S. §§ 67.301, 67.302. A record in the possession of a Commonwealth agency or local agency "shall be presumed to be a public record." Section 305(a) of the RTKL, 65 P.S. § 67.305(a). Relevantly, the RTKL defines "public record" as "a record . . . of a Commonwealth agency or local agency that . . . is not exempt from being disclosed under any other Federal or State law or regulation or judicial order or decree." . . . 65 P.S. § 67.102(2). The RTKL establishes the OOR to
>
> > review[ ] record requests and denials of record requests through the lens of the RTKL. In defining "public record" in the RTKL, however, the General Assembly anticipated the OOR's interpretation of other laws. *Cf.* [*Dep't of Lab. & Indus. v.*] *Heltzel*, 90 A.3d [823,] 828 [(Pa. Cmwlth.

35

2014)] . . . . The RTKL contains two caveats related to how other laws impact its presumption that a record is public and, therefore, subject to public disclosure. These caveats concern the nature of a record and the accessibility of a record, which are distinct concepts. *Id.* at 831 . . . .

According to the first caveat, nothing in the RTKL "shall supersede or modify the public or nonpublic nature of a record or document established in Federal or State law, regulation or judicial order or decree." . . . 65 P.S. § 67.306. Thus, where a federal or state law establishes a record as public, the record is not subject to a public record analysis under the RTKL. "Given this significant consequence, a statute should be clear when it establishes the public nature of records." *Heltzel*, 90 A.3d at 832. According to the second caveat, if the provisions of the RTKL "regarding access to records conflict with any other Federal or State law, the provisions of [the RTKL] shall not apply." . . . 65 P.S. § 67.3101.1. **Thus, where a federal or state law prescribes certain procedures to access records in a manner that conflicts with the RTKL, the provisions of the other law prevail**.

*[Energy Transfer v. ]Friedman*, 265 A.3d [421,] 429-30 [(Pa. 2021)] (emphasis added).

*Pa. Pub. Util. Comm'n v. Friedman*, 293 A.3d 803, 814-15 (Pa. Cmwlth. 2023) .

The definition of trade secrets in the RTKL is identical to that contained in the UTSA. *PharmaCann Penn LLC v. Ullery* (Pa. Cmwlth., Nos. 172-174, 183-184 C.D. 2018, filed Oct. 16, 2019), slip op. at 12 n.15 (citation omitted).[8] The UTSA defines a "[t]rade secret" as

[i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

---

[8] While not binding, this Court's unreported opinions may be cited for their persuasive authority pursuant to Rule 126(b)(1) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 126(b)(1), and Section 414(a) of our Internal Operating Procedures, 210 Pa. Code 69.414(a).

36

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Section 5302 of the UTSA, 12 Pa.C.S. § 5302.

In *Eiseman*, our Supreme Court examined the interplay between the RTKL and the UTSA. In doing so, the Court held that "the [RTKL's] self-contained trade-secrets [exemption] supplants the more general application of the [UTSA], based*, inter alia*, on the principle of statutory construction that more specific provisions control over general ones." *Eiseman*, 125 A.3d at 32 (citing Section 1933 of the SCA, 1 Pa.C.S. § 1933). The Court further reasoned that it is unlikely the General Assembly would have withheld trade-secrets protection relative to financial records within the four corners of the RTKL on the theory that such protection persists under a different statute. *Id.* If the General Assembly had wished to withhold the disclosure of trade secrets, the Supreme Court explained, it could have "provide[d] for redaction of trade-secrets information in Section 708(c) of the [RTKL], as was done in relation to eight of the other openness [exemptions] which are otherwise withheld from financial records. *See* 65 P.S. § 67.708(c)." *Eiseman*, 125 A.3d at 32. While the Supreme Court recognized that the RTKL "generally recognize[s] the primacy of other laws," it held that the RTKL's "own express and specific treatment of trade secrets should control in this instance[,]" otherwise "the trade-secrets aspect of the [exemption] in Section []708(b)(11) would be rendered into a mere redundancy. Such a holding, however, would contravene the presumption that the

37

Legislature does not fashion statutory prescriptions as surplusage." *Id.* at 32-33 n.13 (citations omitted).

This Court has continued to follow *Eiseman's* reasoning. *See PharmaCann*, slip. op. at 12 n.15 (rejecting the contention that the UTSA may serve as an exception to the RTKL "to exempt public records containing no trade secrets at all" and stating "[t]he RTKL's "self-contained trade-secrets [exemption] supplants the more general application of the [UTSA]," so that the OOR need not separately analyze whether the UTSA applies. *See Eiseman*, 125 A.3d at 32-33."). While Magellan urges us to consider the possibility that the General Assembly's failure to include trade secrets among the short list of exemptions in the RTKL applicable to financial records may have been an oversight, which it is seeking to correct through pending legislation, stare decisis binds this Court to follow decisions of the Pennsylvania Supreme Court and those of our own Court until they are either overruled or compelling reasons persuade us to hold otherwise. *State Farm Mut. Auto. Ins. Co. v. Dep't of Ins.*, 720 A.2d 1071, 1073 (Pa. Cmwlth. 1998). Thus, *Eiseman*'s holding is controlling.

### D. *Whether common pleas abused its discretion and violated Section 708(b)(11) of the RTKL when issuing its July 6, 2022 Order without any supporting analysis*

#### 1. Parties' Arguments

Finally, Magellan argues common pleas "baldly" characterized the redacted material as part of a financial record without conducting a thorough analysis and in disregard of Leonard's affidavits. (Magellan's Br. at 45.) Magellan faults common pleas for relying in large part upon *Eiseman* in reaching its decision without considering the applicability of *Eiseman*'s progeny, *Baron*, and *GTL*. (Magellan's Br. at 45-46; Magellan's Reply Br. at 26-27.) Magellan asserts that common pleas' failure to recognize the confidential proprietary and/or trade secret nature of the

38

redacted information will harm Magellan's competitive advantage as competitors like Optum now can, and likely will, utilize the information to compete with Magellan for subsequent contracts. (Magellan's Br. at 46.)

In response, Requesters argue that this Court is not bound by common pleas' determination. Notwithstanding, common pleas heard oral argument on Magellan's claims, read its brief, and specifically addressed and dismissed its arguments. (Requesters' Br. at 31; *see also* Notes of Testimony (N.T.) 5/18/22 at 1-50.[9]) Common pleas detailed the contents of each redaction and explained why the information contained therein should be revealed. (Requesters' Br. at 31.)

### 2. Analysis

As previously stated, we are to determine whether common pleas' findings of fact are supported by substantial evidence or whether it committed an error of law or an abuse of discretion in reaching its decision. *Butler*, 172 A.3d at 1178 n.7. The trial court issued numerous and comprehensive findings of fact and conclusions of law in support of its July Order and further expounded upon those findings in its Rule 1925(a) Opinion. Therein, and with the benefit of the unredacted Agreement, the trial court engaged in a detailed discussion as to the contents of each redacted portion of the Agreement. In its Rule 1925(a) Opinion, common pleas applied the relevant statutory authority and caselaw to its ultimate finding that the entire Agreement should be made available to Requesters. Thus, we disagree that common pleas abused its discretion or did not conduct a thorough analysis. We have also conducted a thorough review of the entire record herein, including an unredacted copy of the Agreement, as well as the statutory authority and caselaw, and for the

---

[9] Although the notes of testimony do not appear in the Reproduced Record, they are part of the original record.

reasons discussed above, we agree that the redacted information is not protected by the RTKL.

## IV.  CONCLUSION

By its own terms, the Agreement was the result of negotiations between Magellan and County to ensure Medicaid recipients in County were provided necessary services under the HealthChoices Program.  Pursuant to the RTKL, Requesters have sought disclosure of the unredacted Agreement, and following our review, we agree that the redacted provisions are disclosable because, pursuant to *Eiseman*, the Agreement constitutes a financial record under Section 102 of the RTKL, as it encompasses a contract dealing with the disbursement of public money and service acquisitions by County to meet its legal obligations.  Moreover, the redacted provisions are not protected from disclosure by the UTSA, as per the RTKL's trade secrets exemption under Section 708(c) as interpreted by *Eiseman*. Thus, we affirm common pleas' July 6, 2022 Order requiring the disclosure of the Agreement in its entirety.

_____

**RENÉE COHN JUBELIRER,** President Judge

Judge Wallace did not participate in the decision in this case.

40

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Garrett Hancock                        :
Optum Inc.                            :
                                   :
                v.                  :   No.  846 C.D. 2022
                                   :
Magellan Behavioral Health     :
of Pennsylvania Inc.,          :
                Appellant    :

# O R D E R

**NOW**, August 15, 2023, the Order of the Court of Common Pleas of Montgomery County, dated July 6, 2022, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** President Judge